Vernon COOPER, Appellant/Appellee,

v.

STATE of Tennessee,
Appellee/Appellant.

Court of Criminal Appeals of Tennessee,
at Knoxville.

June 9, 1992.

Charles W. Burson, Attorney Gen., and James W. Milam, Asst. Atty. Gen., Nashville, Gary D. Gerbitz, Dist. Atty. Gen., and Stephen M. Bevil, H.C. Bright, Asst. Dist. Attys. Gen., Chattanooga, for the State.

William B. Mitchell Carter, Karen Broadway Petosa, Chattanooga, for Cooper.

## OPINION

TIPTON, Judge.

The petitioner, Vernon Cooper, and the state have both appealed from the Hamilton County Criminal Court's action on the petitioner's claim for post-conviction relief. The trial court denied the petitioner relief from his conviction for murder in the first degree, but it vacated his death sentence on the ground of ineffective assistance of counsel. The petitioner was originally convicted in a jury trial in February, 1985, for the first degree murder of his estranged wife. The conviction and sentence were affirmed on direct appeal to the Tennessee Supreme Court. *State v. Cooper*, 718 S.W.2d 256 (Tenn.1986), *cert. denied*, 479 U.S. 1101, 107 S.Ct. 1332, 94 L.Ed.2d 183 (1987).

On July 17, 1987, the petitioner instituted this post-conviction proceeding. After an evidentiary hearing, the trial court made its determinations. In his appeal, the petitioner contends the following:

I.   He received the ineffective assistance of counsel because

(a) counsel failed to introduce evidence of his mental condition which would have been a defense to first degree murder,

(b) counsel failed to claim that the jury was not drawn from a fair cross-section of the community,

(c) counsel failed to have jurors excused for cause, and

(d) counsel submitted an inadequate brief on direct appeal.

II. The trial court erred in precluding the petitioner from calling the district attorney general and an assistant prosecutor as witnesses on his claim that the district attorney general abused his discretion in seeking the death penalty.

In its appeal, the state contends that the petitioner received the effective assistance of counsel at the sentencing hearing. Also, it claims that the trial court abused its discretion by ordering the appointment of a psychologist to aid the petitioner in his preparation of the post-conviction case.

The petitioner was convicted for the November 5, 1984, killing of his estranged wife. Although the evidence against the petitioner is stated in great detail in the Supreme Court opinion in the direct appeal, a synopsis was provided as follows:

> He shot his wife four times with a pump shotgun at her place of employment, a self-service gasoline station, at midday in the presence of numerous witnesses. He fled from the scene in his automobile and was apprehended only after a dangerous and high-speed pursuit through heavy traffic. His own testimony revealed that the homicide was the result of careful and deliberate planning on his part after having warned his estranged wife and her family of his intentions.

718 S.W.2d at 256. The evidence reflected that the petitioner made several death threats against the victim and had twice before been to the station on the day of the shooting. The aggravating circumstance found by the jury to warrant the death penalty was:

> The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. . . .

T.C.A. § 39–2–203(i)(5). In reviewing the case, the Supreme Court said that the evidence was clearly sufficient for the trier of fact to find the presence of both torture and depravity of mind beyond a reasonable doubt. 718 S.W.2d at 260.

The defense proof at the trial of the guilt phase came from three witnesses. A records custodian submitted court records of the pending divorce case filed in August, 1984, by the victim reflecting the ground to be irreconcilable differences and showing that a property agreement had been signed by her and the petitioner. A Diane Gray testified that she met the petitioner at a local billiards establishment on five or six occasions over a period of four to six weeks beginning in September, 1984. She said the petitioner appeared upset and a "little depressed."

The petitioner's testimony on direct examination began with his explanation of why the divorce was filed. He related events regarding the victim not having anything further to do with him and refusing to talk to him. He stated that her actions upset him to the point that he could not sleep. He said he thought of killing himself. Most of his direct testimony, which takes ten pages of transcript, dealt with the shooting and the events leading up to it, in terms of his buying the weapon, test-firing it, taking it to the victim's work place and killing her. At one point, he said that he did not go to the station with the intent to kill her, but he later said he did not know if he had any plan to kill her. The state's cross-examination was a textbook example of the destruction of direct testimony, particularly in terms of showing that the petitioner deliberately and premeditatedly killed his wife.

At the trial of the penalty phase, the state called no witnesses. The only witness called by the defense was the petitioner's sister, Shirley Ann Giles. Her testimony, covering four pages of transcript, was that the petitioner was depressed since his separation from the victim and was upset about not having a job. She said his emotional state had changed while he was in jail awaiting trial, but she did not state in what manner. She said that their father died when the petitioner was thirteen, but she was unable to articulate its emotional impact on the petitioner. She stated that the petitioner did not talk about his feelings and "kept things inside." Finally, trial counsel elicited from her that the petitioner had a temper. The state did not cross-examine.

## POST–CONVICTION HEARING

The petitioner was represented by two attorneys at the murder trial, with one attorney clearly acting as trial counsel. The second attorney had represented the petitioner at the preliminary hearing and was reappointed several weeks before the trial to assist the trial attorney. Most of the evidence at the post-conviction hearing dealt with the petitioner's mental condition and personal history.

The trial attorney testified that he had apparently lost his file on the petitioner's case in an office move and had no personal notes nor work product to which he could refer. Thus, most of his testimony was from personal memory. He stated that his first appearance for the petitioner was in early December, 1984, shortly after he was appointed. He testified that he was aware of two mental evaluations which were done on the petitioner. One occurred before he was appointed and the second occurred afterward.

The record reflects that two court-ordered mental evaluations were made of the petitioner before his trial. Both orders stated that the examination was "for the purpose of determining competency to stand trial and sanity at the time of the offense" and both directed the examiner to submit a written report to the trial court regarding the evaluation in these two areas.[1] Separate evaluations were performed by Dr. Kenneth Nickerson, a clinical psychologist, and Dr. David MacNaughton, a psychiatrist.

On November 24, 1984, Dr. Nickerson prepared a three-page forensic evaluation in which he concluded that the petitioner was competent to stand trial and that there was "no support for an insanity defense." This document indicated a three-person team interviewed the petitioner. No other mental diagnosis was included in the report.

On February 11, 1985, Dr. MacNaughton prepared a letter, which was slightly over one page, addressed to the trial attorney. It noted that the examination was for the purpose of determining sanity and competency to stand trial. Dr. MacNaughton diagnosed the petitioner as having intermittent explosive disorder, but was of the opinion that the petitioner was competent to stand trial and was not insane at the time of the offense.

Both reports reflected that the petitioner had assaulted a previous girlfriend approximately ten years earlier which resulted in him being convicted and serving six months. Also, Dr. Nickerson's report stated, among other things, that the petitioner said he did not have remorse, had acted premeditatedly and had not shed a tear over the victim's death.

The trial attorney testified that he had Dr. Nickerson's three-page report, but he did not talk to him personally. He stated that he was satisfied with Dr. Nickerson's ability based on past experience and that the information in the report satisfied him "that a psychological approach to the case would not be beneficial." Also, he had Dr. McNaughton's letter and he recalled that he talked to him once by phone, but it was to obtain the results of the evaluation before the report was sent. He did not recall providing any background information to Dr. McNaughton.

The trial attorney stated that he did not call either doctor because he believed that the contents of their reports would provide a negative image, particularly with regard to violent conduct, and because their conclusion was that there was no psychological justification for the killing. He explained that his intent was to create sympathy for the petitioner, but he did not want to open the door to previous violence.

The trial attorney acknowledged that he did not investigate or obtain school records, information from former employees, information from members of the petitioner's community, jail records[2] or hospital rec-

1. Both orders directed the petitioner's attorney to provide case information, pertinent background psychological/psychiatric information and records, history and other facts which might be helpful to the evaluation.

2. The jail records of the petitioner's pretrial detention reflected that he was placed on "sui-

ords. He said that he did not talk to Dr. Nickerson or Dr. McNaughton regarding the potential for mitigating circumstances. Further, he said that he did not recall if he was told about Dr. Nickerson's emergency examination of the petitioner ninety days before the killing or about the involuntary commitment order which was obtained before, but on the same day of, the killing.

The trial attorney stated that it was hard getting information from the plaintiff because he was depressed and uncommunicative. He said that he mainly talked to the petitioner's sister, Mrs. Giles, in preparation. He said he was made aware of the father's death and the petitioner's problems with coping with it, the fact that the petitioner had been in special education, and suicide attempts.

As to the sentencing hearing, the trial attorney testified that he had not decided before trial who would specifically testify. He said that it was after the guilt phase when he determined Mrs. Giles to be the witness. Also, he stated that the determination may have been the only specific discussion that he had with the family regarding who would testify.

The second attorney testified that he got the order for evaluation by Dr. Nickerson after the preliminary hearing. He had a vague recollection of being told that the petitioner had prior psychiatric problems and he recalled that there had been an attempt at an involuntary commitment before the killing.[3] He indicated that the trial attorney had full authority in deciding trial strategy.

From the petitioner's witnesses, including proffers, the following was shown. The petitioner started the first grade a year late and, also, repeated that grade. School records reflected that he was placed in special education for the third through fifth grades. Testing reflected that he had an I.Q. in the sixties and seventies in his early years.

The petitioner's father was an alcoholic and, when the petitioner was thirteen, had died from a broken neck suffered in a fall. The petitioner became more withdrawn after his father's death and would have periods when he would not talk to others. He went through stages of depression which were longer in duration as he grew older.

The petitioner did not finish high school. He had difficulty holding a job and was a slow learner. He had been treated at Erlanger Hospital in 1970 and 1974 for drug overdoses which were viewed as suicide attempts, according to hospital records. There were several other events which witnesses characterized as suicide attempts.

In August, 1984, after his separation from the victim, the petitioner got very depressed. He would not leave his house, which he kept dark with the blinds drawn. His sister took him to a mental health facility where he was seen by Dr. Nickerson. An emergency screening evaluation was done in which Dr. Nickerson diagnosed him as having dysthymic disorder with a recommendation of in-patient treatment and evaluation. Among other things, the evaluation stated the following:

> He says he has cussed out God, and can't believe in anything any more. He has had violent moods, and is afraid he might do something stupid, like kill somebody. He said he feels like he is sitting on a time bomb.

Dr. Nickerson indicated that medication was a course of treatment, but not if the petitioner lived alone, because of his suicidal tendencies.

At the hearing, Dr. Nickerson testified that he considered the petitioner's condition to involve significant emotional disturbance and that he had considered an involuntary commitment. The petitioner refused in-patient treatment. Dr. Nickerson, also, indicated that, without treatment or a change, there was a good probability that the peti-

---

cide watch" and that he received no misconduct citations.

**3.** The record reflects that Dr. Nickerson's records showed that he received a telephone call

from the second attorney who stated that he was appointed the guardian ad litem for the petitioner relative to the commitment proceeding.

tioner's condition would deteriorate from that which he saw in August, 1984.

Dr. Nickerson acknowledged that the petitioner was in the category of persons who were legally sane and competent to stand trial, but had severe mental or emotional problems. He said there could have been further testing to refine his diagnosis, but it was not done. Also, he said that if the attorneys had contacted him, he could have discussed the petitioner's condition with them.

An attorney with experience in defending capital crimes cases testified for the petitioner. He stated that there was substantial evidence regarding the petitioner's background which would be useful in mitigation. He indicated that a psychologist or psychiatrist would have assisted in determining how the petitioner's mental condition related to the petitioner's background and the killing.

Mrs. Giles testified that she told the trial attorney about the petitioner's depression, attempted suicide, and his seeing Dr. Nickerson ninety days before the killing. She said that the trial attorney told her that he would get the various hospital records. She said that she told the attorney about the involuntary commitment order which she had obtained for the petitioner on the day of the killing. In this regard, the commitment documents reflected that the petitioner was depressed, threatened to kill the victim, and refused voluntary hospitalization. She said that the trial attorney notified her of her testifying only after the guilt phase trial had concluded. She said that she was aware of the petitioner's two trips to the hospital for suicide attempts.

Dr. David A. Solovey, a clinical psychologist in the Chattanooga area, testified regarding his evaluation of the petitioner at the request of the post-conviction attorneys. In order to obtain the petitioner's development history and social history, he relied upon information obtained from the petitioner, his mother, sister, the post-conviction attorneys, the prior evaluations, and

medical records. He stated that these were critical to developing a sound evaluation. Also, he gave the petitioner a battery of psychological tests regarding intelligence, personality, emotional status and neurological condition.

Dr. Solovey testified that the petitioner had an affective disorder which related to recurrent major depression over a long period of time. He said the petitioner's condition was not common among the general population. Also, it affected the petitioner's mood and behavior, his interpretation of people's behavior toward him, and his reactions to them. His opinion was that at the time of the killing, the petitioner's condition had deteriorated to a "full active phase of a major depressive episode" and that the petitioner committed the crime "under the influence of an extreme mental and emotional disturbance." However, Dr. Solovey stated that the petitioner was legally sane at the time of the offense and would have been competent to stand trial.

Dr. Solovey testified that he was made aware of six events which he characterized as suicide attempts by the petitioner. Also, he indicated that the petitioner's condition was consistent with homicidal or "extended suicidal processes" being involved. Further, he indicated that the statements in Dr. Nickerson's report showed that the petitioner had serious emotional problems. He stated that the petitioner's condition was treatable with medication.

The trial court found that the petitioner received the effective assistance of counsel during the guilt phase. However, it vacated the death sentence, listing a litany of factors in mitigation which were available, but which were not presented at the penalty phase.[4] It stated that it did not view the defense prepared for the sentencing phase and found that it failed to bring out learning disabilities, prior psychiatric problems, and other continuous problems, noting that there had been a failure to develop appropriate mitigating circumstances.

---

**4.** The evidence developed regarding the other issues raised on appeal is addressed in the portions of this opinion dealing with those issues.

In reviewing the trial court's determinations, we are guided by certain rules. The burden was on the petitioner at the hearing to prove his case by a preponderance of the evidence. On appeal, the trial court's findings are conclusive unless the evidence of record preponderates against its determinations. *Turner v. State,* 698 S.W.2d 90, 91 (Tenn.Crim.App. 1985). Further, the burden now rests on the appealing party to illustrate why the record preponderates against the judgment. *Black v. State,* 794 S.W.2d 752, 755 (Tenn.Crim.App.1990).

## EFFECTIVE ASSISTANCE OF COUNSEL

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is upon the petitioner to show (1) that counsel's performance was deficient and (2) that, but for the deficiency, there is a reasonable probability that the result would have been different. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). This standard has been applied, as well, to the right to counsel under Article I, Section 9 of the Tennessee Constitution. *State v. Melson,* 772 S.W.2d 417, 419 n. 2 (1989).

In *Baxter v. Rose,* 523 S.W.2d 930 (Tenn. 1975), our Supreme Court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. 523 S.W.2d at 936. Further, the Court stated that the range of competence was to be measured by the duties and criteria set forth in *Beasley v. United States,* 491 F.2d 687 (6th Cir.1974) and *United States v. DeCoster,* 487 F.2d 1197 (D.C.Cir.1973). It is assistive to review the criteria.

In *Beasley,* the Court stated the following:

[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence.... Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.... Defense counsel must investigate all apparently substantial defenses available to the defendant and must assert them in a proper and timely manner.

491 F.2d at 696 (citations omitted). In *De-Coster,* the Court stated the following:

*In General*—Counsel should be guided by the American Bar Association Standards for the Defense Function. They represent the legal profession's own articulation of guidelines for the defense of criminal cases.

*Specifically*—(1) Counsel should confer with his client without delay and as often as necessary to elicit matters of defense, or to ascertain that potential defenses are unavailable. Counsel should discuss fully potential strategies and tactical choices with his client.

(2) Counsel should promptly advise his client of his rights and take all actions necessary to preserve them.... Counsel should also be concerned with the accused's right to be released from custody pending trial, and be prepared, where appropriate, to make motions for a pretrial psychiatric examination or for the suppression of evidence.

(3) Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed. The Supreme Court has noted that the adversary system requires that "all available defenses are raised" so that the government is put to its proof. This means that in most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the government intends to call, when they are accessible. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. And, of course, the

duty to investigate also requires adequate legal research.

487 F.2d at 1203-04.

Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland v. Washington, supra,* 466 U.S. at 689, 104 S.Ct. at 2065; *see Hellard v. State,* 629 S.W.2d 4, 9 (Tenn. 1982) (counsel's conduct will not be measured by "20-20 hindsight").

■ Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Deference is made for *sound* trial strategy. However, this deference to tactical choices only applies if the choices are informed ones based upon adequate preparation. *Hellard v. State, supra,* 629 S.W.2d at 9; *United States v. DeCoster, supra,* 487 F.2d at 1201.

*Guilt Phase—Mental Condition Defense*

■ The petitioner contends that counsel should have introduced facts which would have provided him with a defense to first degree murder. He asserts that facts existed from which, if presented, the jury could conclude that the petitioner did not have the requisite mental state to commit a premeditated and deliberate murder. Upon such a conclusion, he contends, the jury could have found the petitioner guilty of second degree murder. He relies upon *Drye v. State,* 181 Tenn. 637, 184 S.W.2d 10 (1944), in which our Supreme Court reversed a first degree murder conviction and stated that there may be such provocation as to excite passion in fact which, in some instances, will give rise to second degree murder by negating the "coolly formed premeditated deliberation which is an essential characteristic of murder in the first degree." 184 S.W.2d at 12-13. In relating passion to the various degrees of homicide, the Court quoted from *Rader v. State,* 73 Tenn. 610 (1880) as follows:

"[I]f there was provocation of a sufficient character, and the killing was under passion thus excited, it would be manslaughter. But it is not every provocation that will reduce the killing to manslaughter, not even blows under all circumstances, for the resentment must bear a reasonable proportion to the provocation. Nevertheless, although there be no sufficient provocation to reduce the killing to manslaughter, still there may be such provocation as to excite passion in fact, and if the purpose to kill is formed in passion thus excited, and executed without time for the passion to cool, it is not murder in the first degree, but murder in the second degree."

184 S.W.2d at 13.

Petitioner's assertion is quickly dispelled in reviewing the record. All the experts agreed that the petitioner's conduct was not *legally* excusable because of his mental condition. None of the experts rendered an opinion that the petitioner's condition was such that he did not commit a premeditated killing. Indeed, Dr. Nickerson would have testified that the petitioner said it was premeditated. Further, the prosecution's evidence was strong regarding the petitioner committing a planned killing.

Although the evidence of the petitioner's mental condition might be relevant to his intent, diminished mental capacity has been held to be inapplicable in Tennessee as a defense to murder. *State v. Croscup,* 604 S.W.2d 69, 72 (Tenn.Crim.App.1980). The jury's determination of the existence of such passion in fact to negate premeditation, as contemplated in *Drye,* does not encompass all forms of passion, because it is recognized that a person may deliberate and premeditate even though controlled by passion. *Franks v. State,* 187 Tenn. 174, 213 S.W.2d 105, 107 (1948).

Given the evidence of premeditation in this case, the trial attorney's decision not to proceed with a "psychological" defense was justified. In any event, we do not view the evidence which the petitioner claims should have been used as the type which would with reasonable probability alter the result.

*Penalty Phase—Evidence in Mitigation*

■ The thrust of the state's contention is that the trial court erred because the trial attorney made a tactical decision not to call either Dr. Nickerson or Dr. McNaughton because the jury would have been made aware of the petitioner's prior violent behavior, his prior suicide attempts, the fact that he said he intended to kill his wife, and the fact that he said he had no remorse. Also, it asserted that the attorney had no obligation to seek further expert assistance. Further, given the information in the expert reports, the state contends that the petitioner has not shown prejudice.

As an example of judicial recognition that an attorney need not submit evidence in mitigation at a penalty phase if it "cuts both ways," the state quotes from *Romero v. Lynaugh*, 884 F.2d 871 (5th Cir.1989), in which the death penalty was reinstated on appeal. We note, though, the quoted portion begins with the statement that "there is nothing to suggest that any mitigating facts were not before the jury" at the trial and it concludes by stating that "while Romero's lawyer did not present evidence at the sentencing phase of trial, the fact is that the evidence of possible mitigating factors was before the jury." 884 F.2d at 877. Thus, although we agree with the state's assertion, in *Romero*, the Fifth Circuit was primarily focused on the fact that if proper evidence of mitigation is already in the record, counsel need not seek to prove it again at the penalty phase. *Accord State v. Melson, supra.*

The state also claims that counsel cannot be faulted for not seeking expert assistance in delving deeper into the petitioner's psychological background and condition than what was presented by the court ordered evaluations. In support, it quotes from *Bertolotti v. Dugger*, 883 F.2d 1503 (11th Cir.1989) to the effect that *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) "does not require that counsel faced with significantly less compelling evidence of mental instability ... must move beyond a preliminary inquiry into an insanity defense and actually 'seek the assistance of a mental health expert.' " 883 F.2d at 1511 (citation omitted). The state's reliance is misplaced.

In *Bertolotti*, the above quoted language specifically dealt with counsel's duty at the *guilt* phase of the trial. The attorney had been aware that a psychologist had monitored the defendant in jail and that the defendant had dealt with a staff psychologist at a previous prison facility. The attorney had spoken to the staff psychologist, determined that the defendant had adjusted well to the prison setting and chose not to seek a mental evaluation. In essence, the Eleventh Circuit held that if the defendant was not exhibiting significant evidence of incompetence or insanity so that the state might not be required under *Ake* to fund an examination, then counsel could not be *per se* deficient for not requesting an examination relative to a mental defense to the crime.

However, the Eleventh Circuit recognized in *Bertolotti* that the issue of a psychological examination for the *penalty* phase is significantly different. "Even though the totality of the evidence discouraged counsel from mounting a psychologically based defense to the substantive crimes, evidence of mental impairment could still have been used during the sentencing phase of the trial." 883 F.2d at 1515–16. The Court cited *Stephens v. Kemp*, 846 F.2d 642 (11th Cir.1988) for the proposition that there is a "greater duty of inquiry into [a] client's mental health imposed for [the] penalty phase of [a] trial." 883 F.2d at 1516.

*Stephens* has similarities to the present case. The trial court ordered a competency/sanity examination. The psychiatrist's written report stated that the defendant was competent and sane, but noted that the defendant said he was in a mental hospital for a few days, four to six months before. Because of this report, the attorney elected not to pursue investigating the defendant's mental condition any further. He did not inquire as to what precipitated the hospitalization nor did he examine the hospital records. At the penalty phase, the defendant's mother was the only witness pre-

sented in mitigation. She testified about the defendant's previous bizarre behavior and his being hospitalized.

In holding that the attorney's decision was proper relative to guilt but improper relative to sentencing, the court stated the following:

> Trial counsel's reliance upon the psychiatrist's written evaluation was reasonable insofar as the guilt phase of the proceeding was concerned, and we find no failure of counsel in that regard. Where no capital sentencing proceeding will follow the guilt phase of a trial, such a decision not to pursue a defense of lack of criminal responsibility is not "outside the wide range of professionally competent assistance." *Strickland v. Washington,* [466 U.S. at 690] 104 S.Ct. at 2066. But when a capital sentencing proceeding is contemplated by counsel aware of the facts of which appellant's trial counsel was aware, professionally reasonable representation requires more of an investigation into the possibility of introducing evidence of the defendant's mental history and mental capacity in the sentencing phase than was conducted by trial counsel in this case.

846 F.2d at 653. *See Elledge v. Dugger,* 823 F.2d 1439, 1445 (11th Cir.1987) (even though two psychiatric reports stated the defendant was sane, when attorney learned that prison authorities had treated the defendant with antipsychotic drugs, failure to seek an expert witness was deficient performance for sentencing purposes).

It is apparent from the record in this case that the focus of consideration by the trial attorney relative to the petitioner's mental condition was guilt phase related. The trial attorney made no effort to talk to either Dr. Nickerson or Dr. McNaughton about evidence in mitigation. In *Bertolotti,* the Eleventh Circuit commented upon the fact that the attorney talked to the prison staff psychologist, but did not question him specifically about the presence of mental problems. Even as to the guilt phase of the trial, the court stated that "counsel's failure to ask this psychologist specifically whether he had noticed any

mental problems in Bertolotti might be considered unreasonable." 883 F.2d at 1515. (The court deemed it harmless, though, because the psychologist's ultimate conclusion would not have supported a defense.)

The trial attorney expressed concern regarding the ten-year-old assault reflected in the doctor's reports and stated that he did not want to open the door by his inquiry. However, without objection at the guilt phase, the state was allowed to ask accusatorial questions of the petitioner regarding him having a violent temper and having violently assaulted another individual. Also, at the penalty phase, the last question the trial attorney asked the petitioner's sister was specifically about the petitioner's violent temper and her answer, although partly evasive, was far from a negative one. This exchange was the last evidence heard by the jury.

As Dr. Nickerson's and Dr. Solovey's testimony at the evidentiary hearing reflected, if the trial attorney had made sufficient inquiry into the petitioner's background and history of mental problems, he would have obtained substantial information, both expert and lay, which would have explained the violence as a result of his mental problems. If the trial attorney, after adequate investigation, had been basically left with the information contained in the doctors' competency/sanity reports, the trial court could not quarrel with the strategy he used. However, the central issue deals with the failure to make adequate investigation in preparation for the penalty phase. When the record shows a substantial deficiency in investigation, the normal deference afforded trial counsel's strategies is particularly inappropriate. As was indicated in *Deutscher v. Whitley,* 884 F.2d 1152, 1160 (9th Cir.1989), the Court will not credit a strategic choice by counsel when counsel "did not even know what evidence was available."

In any event, the trial court determined that the failure to investigate and prepare went far beyond consideration of only the mental health experts. When we look at this case from the trial attorney's perspective at the time of trial, we note that he

chose not to obtain the hospital records, commitment documents, the emergency evaluation documents, or the school records about the petitioner's learning disabilities and problems—materials about which the petitioner's mother and sister testified they made the attorney aware. Also, he did not seek to determine the existence of persons from the petitioner's community or past employment who could corroborate the petitioner's problems. The trial attorney was admittedly dealing with a client who was depressed and was uncommunicative—not in terms of being obstructive, but in terms of being a non-talkative person. There is no record of the trial attorney making any independent investigation of the petitioner's background and history other than talking with the petitioner's mother and sister, whose information he did not pursue.

The United States Supreme Court has held that a death sentence violates the Eighth and Fourteenth Amendments if the sentencer is not allowed to consider "as a mitigating factor, any aspect of a defendant's character or record ... that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978) (plurality opinion). In this regard, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring). In this vein, the Supreme Court "has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *California v. Ramos*, 463 U.S. 992, 998–99, 103 S.Ct. 3446, 3452, 77 L.Ed.2d 1171 (1983); *see State v. Terry*, 813 S.W.2d 420, 424 (Tenn.1991).

We acknowledge that there are many cases which indicate that there is no re-

quirement that the accused must offer evidence at a capital sentencing hearing. *See Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *State v. Melson, supra*. However, an analysis of the cases shows that either the mitigating evidence in issue was already adequately before the jury or the evidence was arguably harmful as well as helpful. Again, both circumstances presuppose that adequate investigation and consideration of the accused's background and character had occurred.

"It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case *and the penalty in the event of conviction.*" A.B.A. Standards for Criminal Justice (2nd ed.), The Defense Function § 4–4.1. (emphasis added). The Commentary to this section includes the following:

> The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. This cannot effectively be done on the basis of broad general emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself. Investigation is essential to fulfillment of these functions.

As was succinctly stated in *State v. Melson, supra*, counsel is "required to exert every reasonable effort on behalf of a client both in the investigation and in the trial of a case." 772 S.W.2d at 421.

In this case, the trial attorney stated that he wanted to invoke sympathy for the petitioner, but he did not investigate the readily available evidence which would have bolstered his position. We hold that the evidence does not preponderate against the trial court's determination that the trial attorney's investigation and preparation for the penalty phase did not meet the

standard required by *Baxter v. Rose, supra.*

The question now becomes whether or not the deficiency was prejudicial. In *Deutscher v. Whitley, supra,* the Ninth Circuit stated that although prejudice is not presumed, the courts "must be especially cautious in protecting a defendant's right to effective counsel at a capital sentencing hearing. The Constitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy." 884 F.2d at 1161. The Court deemed the consideration of such evidence as a " 'constitutionally indispensable part of the process of inflicting the penalty of death.' " *Id.* (quoting *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion)). Tennessee has recognized that the death penalty calls for a greater degree of reliability in the sentencing determination than is required for any other sentence. *State v. Terry, supra,* 813 S.W.2d at 425.

In this case, the petitioner's sister testified, but much of the information she possessed about him was not elicited. Also, the testimony of Ms. Gray, a casual, short-time acquaintance, provided no insight into the petitioner's background and character. Finally, the petitioner's testimony at the guilt phase was far from a full disclosure of the information available about him for mitigation. He recounted only one incident which he said was a suicide attempt, but his account did not lend itself to showing a serious attempt. He was not asked about any other attempt nor was he asked about emergency room treatments for previous attempts. In fact, a review of his trial testimony fully supports the trial attorney's conclusion that the petitioner was uncommunicative.[5]

In *Stephens v. Kemp, supra,* even though the defendant's mother testified as to his previous bizarre behavior and hospitalization, the Eleventh Circuit, in vacating the death penalty, stated that "many others could have testified concerning his be-

havior; the fact that others did not do so undoubtedly diminished the impact on the jury of the facts she described." 846 F.2d at 654. Such a determination applies here. In fact, the state strongly argued to the jury at the penalty phase that the petitioner had presented no credible evidence or documentation that he suffered from real emotional problems. Yet, the record of the post-conviction evidentiary hearing reflects that substantial evidence corroborating the petitioner's problems was readily available to be used.

This is not a case in which multiple aggravating circumstances are present. *See, e.g., State v. Bobo,* 727 S.W.2d 945, 956 (Tenn.1987); *Bertolotti v. Dugger, supra,* 883 F.2d at 1519. The jury found the presence of only one aggravating circumstance which it undoubtedly concluded outweighed any mitigating circumstances. Under T.C.A. § 39–2–203(g) (1982), the jury was not required to make any written findings of mitigating circumstances and we are left only to speculate what it may have found and what weight, if any, was given. However, the evidence which, but for the lack of investigation and preparation, was readily available bore directly upon the issues regarding whether the petitioner was under the influence of extreme mental or emotional disturbance or was acting under extreme duress, circumstances which provided mitigation under T.C.A. § 39–2–203(j) (1982). Likewise, under the statute, the evidence could be used by the jury to find circumstances in mitigation which are not specifically delineated in the statute. In consideration of the heightened reliability required in imposing the death penalty, we conclude that the record on appeal does not preponderate against the trial court's implicit determination that there is a reasonable probability that, but for counsel's omissions, the result of the sentencing proceeding would have been different. Thus, the trial court was correct in vacating the

5. In the post-conviction hearing, the contention was made that the petitioner should not have been called to testify. We do not view such a decision as unreasonable. However, given the fact that the petitioner was an uncommunicative person of low intelligence, it would become more important to have other witnesses to testify about mitigating evidence.

sentence of death and ordering a new sentencing hearing.

*Representative Jury Venire*

■ The petitioner claims that he did not receive a fair trial by an impartial jury drawn from a fair cross section of the community—an issue which his trial attorney did not raise. Under the Sixth Amendment and the Due Process Clause, "juries must be drawn from a source fairly representative of the community." *Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975). The Supreme Court has stated that the petitioner must meet a three-prong test.

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to the systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979); *State v. Nelson,* 603 S.W.2d 158, 161 (Tenn.Crim. App.1980).

The evidence[6] in this case reflects that the Hamilton County Jury Commission selected the overwhelming majority of the jury venire from only the registered voters of the county who had actually voted in an election. There was evidence introduced that only two-thirds of the adult citizens of Hamilton County were registered to vote in a particular year in the 1980's, but the record fails to show whether or not this percentage actually applied to the venire from which the petitioner's trial jury was selected.

Further, it appears that the commissioners took it upon themselves to exclude attorneys, accountants, physicians and other persons who would be entitled to occupational exemption pursuant to statutes. *See, e.g.,* T.C.A. § 22–1–103. Finally, they excluded persons over seventy-five years of age unless known to be in excellent health and willing to serve.

First, we note that the exemptions provided by statute, such as T.C.A. § 22–1–103, are personal, to be claimed by or waived by the prospective jurors who are entitled to them. *East v. State,* 197 Tenn. 644, 277 S.W.2d 361 (1955). Thus, the jury commission was wrong in removing those persons on its own initiative. *See Smith v. State,* 566 S.W.2d 553 (Tenn.Crim.App. 1978). However, the fact that an incorrect procedure was followed does not automatically equate with constitutional error. In this respect, we are mindful that post-conviction relief may only be obtained if the conviction or sentence is void or voidable because of the violation of a constitutional right. T.C.A. § 40–30–105.

The record indicates that the jury commissioners systematically excluded the non-voters and particular persons whom they viewed to have exemptions. It also indicates that such exclusions resulted in those groups being substantially underrepresented in the jury venires. Thus, the second and third prongs of the test under *Duren* would be satisfied. However, we hold that the petitioner has not shown that the excluded persons constituted a "distinctive" or "cognizable" group or groups under the first prong.

There was no evidence introduced to show the makeup of the nonvoting citizens. That is, we have no way of knowing any particular race, religion, sex, ethnic background, economic status or other characteristic upon which a determination can be made relative to the excluded group. The only common characteristic shown in the record is that they had not voted, although

---

6. No proof was introduced on this issue by the parties in the October, 1989, hearing on this case. However, they and the trial court relied upon transcripts of testimony and exhibits taken from two other cases in Hamilton County which were heard in July and August, 1989, and which involved issues regarding Hamilton County's jury venire selection process. We note that this Court has affirmed a conviction in one of the cases. *See State v. Vincent L. Boyd,* No. 1193, Hamilton Co., 1992 WL 17651 (Tenn.Crim.App., Knoxville, Feb. 4, 1992).

there is no evidence of the various reasons for not voting.

In *State v. Caruthers*, 676 S.W.2d 935 (Tenn.1984), our Supreme Court recognized that selection of prospective jurors from voter registration lists is appropriate, even though it may be preferable to supplement the list with some other source of names. *See Jefferson v. State*, 559 S.W.2d 649, 653 (Tenn.Crim.App.1977) (list of utility consumers added to voter registration list). In any event, the Supreme Court stated that, to be successful, an attack on such a method still required a showing "that the method results in the systematic exclusion of a cognizable group from the jury source." *Caruthers*, 676 S.W.2d at 939. In upholding the conviction in *Caruthers*, the Supreme Court stated that the defendant had not shown that a cognizable group had been excluded. Inherent in this holding is the court's determination that it would not presume that nonregistered persons made up a cognizable group.

There may be cases, such as involving race, in which a cognizable group may be presumed to exist. *See, e.g., Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). However, the issue of whether such a group exists within a community is normally a question of fact. *Hernandez v. Texas*, 347 U.S. 475, 478, 74 S.Ct. 667, 670, 98 L.Ed. 866 (1954); *State v. Nelson, supra*, 603 S.W.2d at 163. In this respect, in *United States v. Test*, 550 F.2d 577 (10th Cir.1976), which is cited in *Caruthers*, the Tenth Circuit provided the following factors to be considered in determining the existence of a cognizable group:

> (1) the presence of some quality or attribute which "defines and limits" the group; (2) a cohesiveness of "attitudes or ideas or experience" which distinguishes the group from the general social milieu; and (3) a "community of interest" which may not be represented by other segments of society.

550 F.2d at 591; *State v. Nelson, supra*, 603 S.W.2d at 163. In this case, there is no evidence in the record suggesting that nonvoting persons hold attitudes which are distinctive from those held by the rest of the population. Also, as *Caruthers* indicates, we cannot presume that such distinct attitudes exist among nonvoters.

Likewise, the record is devoid of any evidence which would indicate that the particular individuals, such as doctors, lawyers and persons over seventy-five, who were excluded constituted a cognizable group. We note that this Court has previously stated that it was not willing "to say that the age of sixty-five should mark the boundary for a cognizable element of society." *State v. Blunt*, 708 S.W.2d 415, 418 (Tenn.Crim.App.1985). Absent proof to the contrary, "persons within a specific age group do not constitute a distinct identifiable class in the general population." *Teague v. State*, 529 S.W.2d 734, 739 (Tenn. Crim.App.1975); *see United States v. Test, supra*, 550 F.2d at 593. Thus, people over the age of seventy-five should not be considered as a cognizable group on the record in this case.

Obviously, doctors share the same profession with each other, but there was no evidence that they share unique attitudes or ideas or that they possessed a community of interest which is not represented by other segments of society. The same can be said for the other persons excluded by the jury commissioners in this case. In any event, we note that states "are free to grant exemptions from jury service to individuals in case of special hardship or incapacity and to those engaged in particular occupations the uninterrupted performance of which is critical to the community's welfare." *Taylor v. Louisiana, supra*, 419 U.S. at 534, 95 S.Ct. at 700.

In *Rawlins v. Georgia*, 201 U.S. 638, 26 S.Ct. 560, 50 L.Ed. 899 (1906), the Supreme Court was confronted with a complaint that the commissioners failed to put lawyers, preachers, ministers, doctors, engineers and firemen of railroad trains, and dentists into the jury pool from which the grand jury and trial jury involved in the case were selected. In affirming the conviction, the court noted that, viewing the issue as one of exemption, due process did not prohibit a state from excluding certain classes "on the bona fide ground that it was for the

good of the community that their regular work should not be interrupted...." 26 S.Ct. at 561. Thus, the fact that the state could statutorily exempt the various classes of persons listed in T.C.A. § 22–1–103 would indicate that it was not constitutional error to exclude those same persons. We hold there was no constitutional error in the jury venire selection process and, thus, the petitioner did not receive the ineffective assistance of counsel for counsel's failure to raise this issue.

*Voir Dire and Jury Selection*

The petitioner asserts that his trial attorney failed to delve extensively into jurors' prior knowledge of and opinions about the case. He, also, claims that the trial attorney failed to challenge for cause a particular juror. He cites no authority in support of this issue.

The attorney with capital trial experience gave his opinion about the trial attorney's general handling of voir dire and about the particular voir dire of various prospective jurors. He said that the trial attorney's actions were deficient.

■ We note that the prospective juror identified in the petitioner's brief was excused peremptorily. Also, the record indicates that neither petitioner nor the state exhausted its peremptory challenges which effectively negates any harm flowing from the failure to challenge for cause. *Sommerville v. State*, 521 S.W.2d 792, 797 (Tenn.1975); *State v. Crawford*, 620 S.W.2d 543 (Tenn.Crim.App.1981). In any event, the record reflects that the juror ultimately stated that he could give the petitioner the benefit of the presumption of innocence, could decide the issues based only on the evidence, and could consider both life and death sentences. Thus, the record does not reflect that a basis existed to excuse this juror for cause. Tenn. R.Crim.P. 24(b).

The attorney's opinions primarily centered around two sets of prospective jurors that were questioned. First, he pointed to instances in which he claimed that trial counsel did not sufficiently question in order to show grounds for challenge for cause. However, all of these persons were excused by peremptory challenges. As previously stated, no harm could flow to the petitioner when his peremptory challenges were not exhausted.

■ Second, the attorney pointed to instances in which persons were excused for cause because of their views about the death penalty. Trial counsel objected to some of the disqualifications, but criticism is leveled at trial counsel's failure to attempt to rehabilitate these prospective jurors so as to foreclose a challenge for cause. The record reflects that most of the persons clearly stated that they could not or would not impose the death penalty regardless of the evidence. They left little leeway for rehabilitation and the post-conviction hearing record provides no indication that they could have been rehabilitated. Rehabilitation of a prospective juror who has formed or expressed an opinion which shows a lack of impartiality in the case should only be allowed with great care. *See State v. Strouth*, 620 S.W.2d 467, 471 (Tenn.1981); Tenn.R.Crim.P. 24 Advisory Commission Comments. The unequivocal statements from these prospective jurors entitled the trial court to disqualify them for cause. *See Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). We do not fault the trial attorney for not attempting to rehabilitate these prospective jurors.

As to the general complaint regarding the trial attorney's voir dire, the attorney's testimony reflects that he generally would have gone into more detail about prospective jurors' opinions on the case and their understanding of the death penalty statutory requirements. This preference does not mean that trial counsel was ineffective in his voir dire nor that the petitioner did not get the benefit of an impartial jury. Two attorneys could pursue different—indeed, opposite—questioning techniques during jury selection with both attorneys being viewed as rendering reasonably competent assistance of counsel under *Baxter v. Rose*,

*supra.* The record does not indicate that trial counsel's voir dire was inappropriate. Thus, the petitioner did not receive ineffective assistance of counsel during voir dire and jury selection.

*Appeal Counsel*

■ The petitioner asserts that he was inadequately represented on appeal in violation of his constitutional right to the effective assistance of counsel on direct appeal. *Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). He points to no specific issue lost or prejudice incurred, but he claims that the representation was, in effect, the equivalent of him having no counsel at all so as to require no showing of prejudice. *See Penson v. Ohio,* 488 U.S. 75, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988).

We may not decide this issue. T.C.A. § 40–30–103(b)(1) provides that a post-conviction issue of effective assistance of counsel on appeal "shall be heard and determined by ... the appellate judges who reviewed such conviction, if ... available." This case was appealed directly to the Supreme Court pursuant to then existing law. *See* T.C.A. § 39–2–205 (1982) [repealed]. Thus, determination of the issue must be by the Supreme Court upon the record established in the trial court. *See State v. Clark,* 774 S.W.2d 634 (Tenn.Crim.App. 1989).

An order transferring the case relative to this issue is appropriate and shall be entered with the filing of this opinion. Rule 17, T.R.A.P.; *see Sidney Porterfield v. State,* No. 54 Shelby Co., 1990 WL 62823 (Tenn.Crim.App., Jackson, May 16, 1990).

### ABUSE OF ATTORNEY GENERAL DISCRETION

■ The petitioner contends that it was error for the trial court to refuse to allow him to call the district attorney general and one of the assistant prosecutors as witnesses on the issue of the state's abuse of discretion in pursuing the death penalty for him. The state responds that the prosecutor has the discretion to determine the scope of prosecutions of criminal conduct and that the district attorney general

should not be required to defend his decisions. The trial court had ruled that the abuse of discretion question was one of law and that since the prosecution had the legal discretion involved, the petitioner was not entitled to the testimony on this issue.

First, we note that the amended petition alleged the abuse of discretion issue as follows:

15. Petitioner was deprived of his due process rights and the exercise of the district attorneys [sic] "discretion" to seek death in this case violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 1, Sections 8 and 16 of the Tennessee Constitution in that the District Attorney's office has unbridled discretion in seeking the death penalty and in this case the selection of the death penalty was arbitrary and unconstitutional.

The record does not reflect that the petitioner clarified this claim. The state filed no answer to the petition as amended. In his brief, the petitioner states that he was attempting to show a "denial of equal protection by virtue of the failure of the District Attorney to have any system to determine which cases merited prosecution seeking the death penalty."

Prosecutorial discretion in the charging process is very broad, but it is limited by certain constitutional constraints. For instance, due process may be implicated if a prosecutor vindictively increases a charge to a felony after a misdemeanant has invoked an appellate remedy. *See Blackledge v. Perry,* 417 U.S. 21, 27, 94 S.Ct. 2098, 2102, 40 L.Ed.2d 628 (1974). Also, the decision to prosecute may not be " 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.' " *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668–669, 54 L.Ed.2d 604 (1978) (quoting *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962)). In the latter instance, selective prosecution claims are viewed according to equal protection standards. *See Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985).

In *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), the Supreme Court, in a five to four decision, dealt with a claim that the defendant's Georgia death penalty violated the Equal Protection Clause of the Fourteenth Amendment because he was black and his victim was white. His discrimination claim was viewed as extending to all actors in the process, including "the prosecutor who sought the death penalty and the jury that imposed the sentence." 481 U.S. at 292, 107 S.Ct. at 1767. He sought to prove this through a statistical study of over two thousand murder cases in Georgia in the 1970's, which indicated that black defendants who killed white victims have the greatest likelihood of receiving the death penalty. The Court held that, given the innumerable factors which come into play in any given sentencing decision, it would not apply the inference of racial discrimination drawn from the general statistics to any specific sentencing decision. In reaching this conclusion, the court stated the following:

> Our analysis begins with the basic principle that a defendant who alleges an equal protection violation has the burden of proving "the existence of purposeful discrimination." *Whitus v. Georgia,* 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967). A corollary to this principle is that a criminal defendant must prove that the purposeful discrimination "had a discriminatory effect" on him. *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985). Thus, to prevail under the Equal Protection Clause, McCleskey must prove that the decision makers in *his* case acted with discriminatory purpose. He offers no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence.

481 U.S. at 292–93, 107 S.Ct. at 1767 (footnote omitted).

In *McCleskey,* the Court indicated a reluctance to require prosecutors to defend or justify their decisions to seek the death penalty, at least in the context of, years later, having to rebut a study's analysis of many other prosecutors' actions. 481 U.S. at 296 and n. 17, 107 S.Ct. at 1769 and n. 17. However, we do not equate this reluctance with a full prohibition against a petitioner's calling the prosecutor as a witness in order to prove a discriminatory practice. In fact, the prosecutor's testimony was part of the record before the Supreme Court in *McCleskey.* In context, we interpret the Court as only indicating that the general study did not prove a prima facie case of discrimination so as to require the prosecutor to carry the state's burden of justifying the decision to seek the death penalty.

It may be that certain limitations may be appropriate in terms of requiring a prosecutor to testify. We know, as well, that trial courts have some discretion in limiting the calling of witnesses. *See, e.g., Bacon v. State,* 215 Tenn. 268, 385 S.W.2d 107 (1964). However, we need not decide what limits, if any, should apply in this type of case.

The petitioner was obligated to allege facts upon which his ground for post-conviction relief would be justified. T.C.A. § 40–30–104(a)(10). If his allegations are only conclusory in nature or do not otherwise show a constitutional violation, the trial court is entitled to dismiss the particular claim without an evidentiary hearing. *See Swanson v. State,* 749 S.W.2d 731, 736 (Tenn.1988); *Givens v. State,* 702 S.W.2d 578, 580 (Tenn.Crim.App.1985). In this regard, we do not view the petitioner's allegations in paragraph fifteen of his amended petition as raising a claim worthy of constitutional significance.

The petitioner failed to allege what facts were believed to exist to show how *his* constitutional rights were violated. Nor did he allege what discriminatory practice or result occurred in his case. Simply put, the petitioner has not, through his pleadings or argument, told either the trial court or this Court what he claims the prosecutor did which was constitutionally improper.

■ As previously indicated, a prosecutor has wide discretion in the charging process, including the decision to seek the

death penalty. *See Gregg v. Georgia,* 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976). Also, the fact that a prosecutor has no system by which to determine which cases merit pursuit of the death penalty, although perhaps providing fertile ground for abuse, does not show the existence of vindictiveness or improper discriminatory practices in a given case. Finally, to claim that the discretion is "unbridled" adds nothing to aid us in attempting to glean any specific unconstitutional activity in this case. Thus, the trial court was entitled to reject the petitioner's claim, as a matter of law, and it committed no error in ruling without allowing the petitioner to call the district attorney general and his assistant.

## POST–CONVICTION APPOINTMENT OF EXPERT

 The state asserts that the trial court acted arbitrarily and illegally in ordering the funding of the appointment of Dr. Solovey to aid in preparation of the post-conviction case. The state contends that the appointment was arbitrary since it was not authorized by statute or case law, citing *Teague v. State,* 772 S.W.2d 915, 927 (Tenn.Crim.App.1988) in which this Court was confronted with a claim for investigative services in a post-conviction case. This Court concluded that Tennessee Supreme Court Rule 13.2.B(10) and T.C.A. § 40–14–207(b), dealing with the provision of investigative and expert services in capital cases, apply only to the *trial* of an accused in a capital case and not to post-conviction cases.

Further, the state contends that the order was illegal because it was in violation of a previous order of this Court in this case. The record reflects that the petitioner's initial motion for an ex parte hearing regarding funds for an expert was denied. The petitioner applied for an extraordinary appeal to review the denial, but the application was rejected by this Court. Then, the matter was heard by the trial court in open court and the motion for funding was granted. Contrary to the state's position, this Court's order did not prohibit the sub-

sequent actions taken by the petitioner and the trial court.

In any event, we note that the state is seeking an after-the-fact review, i.e., the appointment, the rendering of services, and the funding have already occurred. The state was aware of the order at the time of its entry, two months before the evidentiary hearing was held. It did not elect to seek interlocutory or extraordinary review of the trial court's actions at a time which would have rendered review meaningful in this case. We determine that any ruling that we could make in this case would be advisory only since the issue is moot. We elect not to consider it in this appeal. *See State v. Doe,* 813 S.W.2d 150 (Tenn.Crim. App.1991); *State ex rel. Lewis v. State,* 208 Tenn. 534, 347 S.W.2d 47 (1961).

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

WADE, J., and EDGAR P. CALHOUN, Special Judge, concur.