IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs March 11, 2003

**SHAWNDA JAMES v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Giles County**
**No. 9891     Stella L. Hargrove, Judge**

_____

**No. M2002-00968-CCA-R3-PC - Filed April 1, 2003**

_____

Petitioner appeals the dismissal of her petition for post-conviction relief by the Giles County Circuit Court. She was originally convicted of premeditated first degree murder and especially aggravated robbery. In this appeal, she contends the post-conviction court erred by finding she received the effective assistance of counsel and argues trial counsel was deficient in not filing a motion to suppress her confession. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ALAN E. GLENN, J., joined.

Claudia S. Jack, District Public Defender; and Robert H. Stovall, Jr., Assistant District Public Defender, for the appellant, Shawnda James.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; and Mike Bottoms, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The petitioner, a juvenile at the time of the offenses, was convicted by a Giles County jury of the premeditated first degree murder and especially aggravated robbery of her aunt, with whom she was residing. The trial court sentenced her to life imprisonment for the murder and to a concurrent eighteen-year term for the robbery. This court affirmed her convictions on direct appeal. _See_ State v. Shawnda James, No. 01C01-9803-CC-00093, 1999 Tenn. Crim. App. LEXIS 865 (Tenn. Crim. App. Aug. 11, 1999, at Nashville), _perm. to app. denied_ (Tenn. 2000). She timely filed a petition for post-conviction relief, which was denied by the post-conviction court. This appeal ensued.

# FACTS

We set forth the following facts contained in our opinion in the direct appeal:

Defendant was raised by her maternal grandparents in Michigan. Her mother was a prostitute and drug addict, frequently in jail. By the time defendant was twelve, both her grandfather and her biological mother had died. Defendant began exhibiting serious behavioral problems and her grades fell precipitously. Defendant received counseling at school and attended a couple of counseling sessions with her grandmother. In the fall of 1994, when defendant was thirteen, defendant's grandmother decided to place defendant with her son, John Douglas James and his wife, Kelly. The Jameses were living in Giles County with their eighteen-month-old son, Corey.

Defendant moved to Tennessee in December 1994. Defendant did not adjust well after the move. She tried to run away and return to Michigan in January 1995 by calling a cab to take her to the airport. The cab driver took her to the sheriff's office instead, and defendant was returned to her aunt and uncle.

On March 5, 1995, a few weeks after defendant turned fourteen, she had an argument with her uncle. He left to go to work at approximately 2:00 p.m. Although there was no eyewitness to the crimes, the evidence at trial established that defendant found James' .35 caliber rifle and tried to load it with a 30.06 cartridge. Because the cartridge was too large for the gun, it jammed. Defendant then found James' .22 caliber rifle and loaded it with one or more .22 caliber shells. She then test-fired the rifle into some bedding in her bedroom and ejected the empty casing.

Defendant then took the gun into her aunt's bedroom where her aunt lay asleep on the bed. Defendant put the muzzle of the gun to her aunt's forehead and fired a single shot, killing her. Defendant tried to move the body in order to hide it, but stopped when she heard a gasp.

Defendant fled the scene in her aunt's car, taking young Corey with her. Defendant also took money from the lockbox, her aunt's purse and wallet, and some of her aunt's jewelry.

Defendant drove into Columbia where she ran out of gas at about 4:15 p.m. Danny Wray and his brother assisted defendant, pushing the car to a gas station and filling it with gas. Wray testified that "she was not nervous."

At about 4:45 p.m. that afternoon, defendant entered a beauty salon in Columbia with Corey and got her hair cut. The hair stylist testified that defendant had identified herself as "Rebecca." Defendant then visited a fast food restaurant and a K-mart, where she bought hair color, lipstick, and a cassette.

At approximately 6:00 p.m. that evening, defendant and Corey were driving north on Highway 31. Defendant ran off the road, and Steve Hallmark stopped to render assistance. Hallmark got Corey out of the car and noticed that the baby's nose was bleeding. He offered to take defendant and Corey to the emergency room, but defendant declined, stating, "I've got to get home." Defendant explained that she was from Michigan and was in Tennessee for a friend's wedding. She told Hallmark that her parents had been killed in a car wreck, and she needed to get home. She asked him to take her to the airport and said she would worry about the car later.

Hallmark initially took defendant to his house, and then to the airport. On the way to the airport, defendant wanted to stop at her car and get the diaper bag. However, when she saw police around the car, she told Hallmark to go on since she would otherwise miss her plane.

Using a one-way ticket purchased in Kelly James' name, defendant and Corey flew to Detroit that night. The next morning they flew to Flint, Michigan, where defendant was apprehended at the airport by local police.

A search of the James' house after the murder revealed the .22 rifle hidden under the mattress of Corey's crib. In defendant's closet was a notebook open to a page on which was written in defendant's handwriting, "things to remember" and the following list:

Clothes & shoes
ring
Chains & jewelry
pack clothes
Cory's stuff
pop
tapes
purse
money
car & house keys
change plates

The items on this list (other than "change plates") were found either in the victim's purse after it was recovered from defendant, or in the car she abandoned.

Charity White was in the Rutherford County Detention Center with defendant after the crimes. White testified that defendant confessed to killing her aunt and told her she had planned the murder "a week in advance." White testified that, according to defendant, defendant had put everything in the car prior to shooting the victim. When she first entered the victim's bedroom, Corey was present, so she took him and placed him in the car. She then returned to her aunt's bedroom and shot her. She

-3-

wanted to hide the body under the house to give herself more time. However, when she tried to move it, she heard a gasp, became scared and left.

Two other inmates of the Center also testified that defendant confessed the killing to them. One of these witnesses, however, testified that defendant claimed that the gun fired accidentally after she changed her mind about shooting the victim.

Shawnda James, 1999 Tenn. Crim. App. LEXIS 865, at **2-6.

## POST-CONVICTION HEARING

The sole issue in this appeal is whether the petitioner's trial counsel was ineffective in failing to seek suppression of the petitioner's statement to the arresting officer in Michigan, who testified at trial that the petitioner admitted killing her aunt.

Although the arresting officer did not testify at the post-conviction hearing, his trial testimony revealed he arrested the petitioner in Flint, Michigan, at the airport. He transported her to her place of detention to await extradition proceedings. He testified his sole purpose was to explain to the petitioner the extradition process and, although he never advised her of her Miranda rights, he never questioned her. The officer stated he did not discuss the facts of the case with her and specifically told her that he did not want to do so. While he was explaining the extradition process, the petitioner volunteered that "she would have to pled [sic] guilty to murder, because she killed her."

The petitioner's trial counsel testified at the post-conviction hearing that the theory of defense was to establish the petitioner's diminished mental capacity in an effort to negate premeditation and deliberation, which at that time were both elements of premeditated first degree murder. *See* Tenn. Code Ann. § 39-13-202(a)(1) (1991). Trial counsel was aware of the petitioner's statement to the Michigan officer and, after considering whether to file a motion to suppress, decided not to do so.

The post-conviction court found that this decision by trial counsel did not demonstrate ineffective assistance of counsel. The trial court further found that trial counsel's defense strategy was a reasonable one and that trial counsel did everything he could to protect the rights of the petitioner. The trial court dismissed the petition for post-conviction relief.

## STANDARD OF REVIEW

For a petitioner to successfully overturn a conviction based on ineffective assistance of counsel, the petitioner must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, the petitioner must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Should the petitioner fail to establish either factor, the petitioner is not entitled to relief. Our supreme court described the standard of review as follows:

Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069). The petitioner is not entitled to the benefit of hindsight; the petitioner may not second-guess a reasonably based trial strategy; and the petitioner may not criticize a sound, but unsuccessful, tactical decision made after adequate preparation for the case. Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see* Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

The petitioner bears the burden of proving her allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f). The findings of fact made by the post-conviction court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. *See* Fields v. State, 40 S.W.3d 450, 457 (Tenn. 2001).

## ANALYSIS

The petitioner contends trial counsel was ineffective by failing to file a motion to suppress her statement to the Michigan officer. Specifically, the petitioner contends the motion would have been granted because the Michigan officer failed to advise her of her Miranda rights. We conclude the petitioner has failed to establish any deficiency by trial counsel or prejudice.

In Miranda v. Arizona, the United States Supreme Court held that the prosecution cannot admit a statement by the defendant stemming from "custodial interrogation" unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966). The Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* Thus, because Miranda is only implicated when the defendant is questioned while in the coercive environment associated with being in police custody, our initial inquiry is whether defendant was subjected to "custodial interrogation."

Unquestionably, the petitioner had been arrested and was, therefore, "in custody" at the time she made the statement. *See* State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996). However, the crucial issue is whether she was subjected to "interrogation." Miranda defined interrogation as "questioning initiated by law enforcement officers." 384 U.S. at 44. However, interrogation refers not only to express questioning, but also to any words or actions that the police should know are reasonably likely to elicit an incriminating response. State v. Walton, 41 S.W.3d 75, 83 (Tenn. 2001) (citing Rhode Island v. Innis, 466 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)).

According to the record before this court, the petitioner was not being interrogated when she made the statement to the Michigan officer. The officer stated he was explaining the extradition

process to the petitioner when she volunteered the statement. Accordingly, there was no requirement for a <u>Miranda</u> warning. In view of this fact, trial counsel could not be deficient in failing to seek suppression on this basis. Furthermore, because the motion would not have been granted had it been filed, the petitioner suffered no prejudice as a result of the failure to file the motion to suppress. In addition, the other evidence against the petitioner was simply overwhelming. We are satisfied the petitioner would have been convicted of these offenses without regard to the petitioner's statement to the officer.

In summary, the petitioner has failed to establish that she received ineffective assistance of counsel. Accordingly, we affirm the judgment of the post-conviction court.

_____

JOE G. RILEY, JUDGE