IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 15, 2006

## DONALD WADE GOFF V. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court of Campbell County**
**No 12,238   E. Shayne Sexton, Judge**

_____E2005-02605-CCA-R3-PC - Filed December 6, 2006

Petitioner, Donald Wade Goff, was convicted following a November 2001 jury trial on two counts of rape of a child, eleven counts of incest, nine counts of rape, seven counts of contributing to the delinquency of a minor, and one count of attempted rape.  The trial court imposed an eighty-year sentence.  On direct appeal, the sentence was modified to fifty-six years based upon this Court's dismissal of the nine rape counts due to lack of evidence of force or coercion.  Petitioner subsequently filed a post-conviction petition on August 9, 2004.  After the appointment of counsel and the filing of an amended petition, the post-conviction court conducted an evidentiary hearing. Following the hearing, the post-conviction court dismissed the petition.  Petitioner filed this appeal claiming the post-conviction court erred in denying his post-conviction petition.  Upon our review, we affirm the post-conviction court.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the**
**Criminal Court is Affirmed**

J. S. DANIEL, SR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., and ALAN E. GLENN, J., joined.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General, William Paul Phillips, District Attorney General; Michael O. Ripley, Assistant District Attorney General, for Appellee, State of Tennessee.

David M. Pollard, Jr., Jacksboro, Tennessee, Attorney for the Petitioner, Donald Wade Goff.

## OPINION

### BACKGROUND

The Petitioner, Donald Wade Goff, was indicted by the Campbell County grand jury in June 2001 on a thirty-six (36) count indictment, including two counts of rape of a child, thirteen counts of incest, eleven counts of rape, nine counts of contributing to the delinquency of a minor, and one count of attempted rape.  The alleged victim was petitioner's daughter.  During a jury trial on these

counts, the trial court entered judgments of acquittal following the state's case-in-chief on two rape counts, two incest counts and on two counts of contributing to the delinquency of a minor. The jury returned guilty verdicts on the remaining counts. Following a sentencing hearing, the trial court imposed an effective eighty-year sentence.

On direct appeal to this Court, a panel of this Court dismissed certain charges due to insufficient evidence and modified the sentence to fifty-six years. See State v. Donald Wade Goff, No. E2002-00691-CCA-R3-CD (Tenn. Crim. App. filed August 5, 2003 at Knoxville). On August 9, 2004, petitioner timely filed his pro se petition for post-conviction relief. Following the appointment of counsel, petitioner filed an amended petition. On October 12, 2005, the trial court conducted an evidentiary hearing. Following the hearing, the trial court entered findings of fact and dismissed the post-conviction petition.

At the evidentiary hearing, petitioner testified that he first met trial counsel in the Campbell County Jail in March 2001, after being arrested on the present charges. He said he met with trial counsel on two occasions prior to the trial – once in March and a second time possibly in September 2001. Petitioner estimated the total time spent with counsel in preparation for trial was twenty minutes to one-half hour. On one of the occasions, petitioner said counsel showed him a written plea offer then asked him to sign the plea with a notation he was rejecting the offer.

Petitioner said counsel also failed to interview certain witnesses, including Timothy Staley and Bruce Gephart. According to petitioner, Timothy Staley lived with petitioner and his ex-wife for approximately fifteen years and "was like a brother" to petitioner. He said trial counsel said he interviewed Staley but did not believe he would make a good witness due to "his weight and appearance." As to Bruce Gephart, petitioner claimed Gephart had been accused by petitioner's daughter of the same acts but were not pursued when his daughter admitted Gephart had done nothing.

Petitioner testified that he and trial counsel had only one discussion about whether petitioner would testify at the trial. He said at the trial, after the state had finished its case-in-chief, counsel took him to a back room and asked if he planned to testify. He maintained that even though he told counsel he did not want to say anything, counsel urged him to testify and explained it would be good for petitioner to get on the stand. Petitioner said counsel's only advice was to tell his side of the story. He said trial counsel assured him that his other daughter, Amanda, (who was present in the courtroom during the proof), could not testify.

When asked about his trial testimony, petitioner acknowledged that it did not go well. He realized after the fact that he had "opened the door" to other testimony. However, he was unaware of such an occurrence or that rebuttal witnesses could be called. He said counsel did not conduct preparation for testifying and did not mention "opening the door" or rebuttal witnesses. When he returned to counsel table upon completion of his testimony, petitioner was told by counsel that he "had blown it." Petitioner noted that when he finished his testimony, the state called his daughter Amanda to testify. He said Amanda told the jury that petitioner had done the same things to her.

Petitioner testified that counsel knew of his disability, low IQ and drug abuse problems but that counsel told him the intelligence issue would not help him. He had no knowledge of trial counsel securing copies of social security records.

Petitioner recalled a videotape of a "Maury Povich Show" episode in which his daughter had appeared. In a letter written from jail, petitioner apologized to his daughter for taking her to the show. The letters were shown to the jury. According to petitioner, the particular episode concerned teens addicted to sex. He and his daughter were asked to be on the show after petitioner's ex-wife called the show in response to the show's solicitation regarding teen sex and drug issues. Petitioner said he provided a copy of the tape to trial counsel.

On cross-examination, petitioner admitted that during his testimony he made the statement "I have never touched any of my daughters in any sexual way." He said he made the comment because he wanted the jury to know he loved his daughters. Petitioner recalled his other daughter Amanda being present in the courtroom but did not understand the implications of her eventual rebuttal testimony.

Petitioner also clarified his earlier statements about his learning deficits. He said he told trial counsel that he received social security benefits because he was not very smart. In response to state questioning, petitioner admitted that he was able to communicate with counsel (though briefly as testified); that he understood the proceedings and the testimony of the witnesses; and that he understood the roles of the parties, the judge and the jury.

When asked about the "Maury Povich Show" tape, petitioner said he believed the tape recording would help him. In his opinion, petitioner thought the tape would show he cared about his daughter and was trying to get help for her drug and sex addictions. He further did not believe that the tape could be portrayed in a negative way to the jury. Petitioner denied that the daughter's appearances on the Povich show could be interpreted as "pimping" his daughter. He said he gave a copy of the tape to trial counsel.

Petitioner said he talked to counsel generally about alibi and/or motive testimony. He questioned the daughter's timing of the allegations and thought counsel should have introduced evidence of his daughter's motivation to lie against him, including her past false accusations about sexual contact with various individuals.

Timmy Ron Staley testified that he had previously resided with the petitioner and petitioner's family for almost fifteen years in Ohio, Kentucky and in Tennessee. He said the petitioner's daughters Alicia and Amanda had accused him of molesting them but that they later admitted they were lying. Staley said he was never interviewed by trial counsel but had given an interview to one of counsel's "subordinates." Staley told this person about the false accusations and the Povich tape. However, he was not called as a witness at trial.

Charles Herman testified that he was employed by the Public Defender's Office of the Eighth Judicial District. He began practicing law in 1974 and had served in the public defender position

3

since September 1990. Although he described the case load as heavy, he added that it was manageable. In his role as public defender, trial counsel was appointed to represent the petitioner.

Counsel said he was sure he had met with petitioner several times on an as needed basis even though the file contained only one document with a specific September meeting date. Mr. Herman said he did not document every time he met with petitioner. Herman specifically recalled the tape from the "Maury Povich Show" which was the subject of a motion in limine. He said he viewed the tape but did not dub a copy; however, he provided his sole copy to the state in reciprocal discovery.

Mr. Herman said he did not file a response to the state's *in limine* motion and that no motion hearing was conducted. He concluded that the tape contained no relevant evidence and that because it was the "Maury Povich Show" that it might do more harm than good. He said his decision not to play the tape was trial strategy.

Counsel had no explanation as to why petitioner's social security records appeared to have been requested after the trial and sentencing hearing. He recalled reviewing the reports and noted the reference to petitioner's IQ of 61. Mr. Herman said he had no trouble communicating with petitioner and had no indication petitioner was unable to understand what he was talking about and what was taking place. He denied that this information would have changed the decision to allow petitioner to testify. Counsel said the state's proof was that petitioner committed these acts. With nothing to rebut the victim's testimony, the jury had nothing to weigh. In hindsight, counsel noted that petitioner did a good job during his testimony with one major exception relating to petitioner's statement that he had never touched his daughters sexually.

[Mr. Herman could not recall whether he knew the petitioner's other daughter, who had made sexual allegations against her father, was present in the courtroom.] Counsel said it was a bigger risk not to put petitioner on the stand because the jury would have nothing to weigh against the state's proof. Herman said they planned for petitioner to testify all along. When asked if he adequately prepared petitioner for his testimony and cross-examination, counsel responded that he did all he could do. Counsel did not recall moving to exclude the rebuttal testimony of Amanda Goff and acknowledged that petitioner opened the door when he broadly responded to counsel's question.

When asked about his decision not to call Mr. Staley, counsel said Staley told him he did not know anything about the case and did not see anything. Herman denied making the statement that all sex offenders should be castrated.

On cross-examination, Mr. Herman could not recall Mr. Staley telling him about false accusations of molestation made by petitioner's daughters followed by their retractions of such claims. He did not recall the name of a potential witness, Gephart, but noted that he would have interviewed any witness given to him by petitioner if he had a way to contact them.

Counsel Herman said he asked petitioner specifically whether he had touched his daughter Alicia in a sexual way. He said that while the initial answer was responsive to the question,

4

petitioner added that he had never touched his daughters in any sexual way. Counsel said he probably expressed some concern about this response with petitioner when he returned to counsel table at the conclusion of his testimony.

## DISCUSSION

In this appeal, petitioner claims generally that the trial court erred in dismissing his petition for post-conviction relief. The primary post-conviction claims related to ineffective assistance of counsel. He narrows the issues on appeal to the trial court's findings on the following three specific issues: (1) whether trial counsel was ineffective in adequately conferring with the petitioner to develop trial strategy and witness preparation and whether trial counsel's choices were informed and based upon adequate preparation; (2) whether trial counsel was ineffective due to his decision not to call witness Tim Staley; and (3) whether trial counsel was ineffective in failing to challenge the state's motion *in limine* and in failing to impeach the victim relating to a videotape of her appearance on the "Maury Povich Show."

### *Burden of Proof*

Tennessee Code Annotated section 40-30-103 (2003), provides that in order for a petitioner to obtain post-conviction relief, the petitioner must show that his or her conviction or sentence is void or voidable because of the abridgement of a constitutional right. The petitioner bears the burden of proving the factual allegations in the Petition for Post-Conviction Relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusion drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). On appeal it is the burden of the petitioner to show that the evidence preponderates against the lower court's findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given were below the "range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693 (1984). Should the petitioner fail to establish either factor, he is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

Goad v. State, 938 S.W. 2d 363, 370 (Tenn. 1996).

5

To establish prejudice of the second prong of the <u>Strickland</u> analysis, a petitioner must demonstrate a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. 466 U.S. at 687-88, 692, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id</u>. at 694.

On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. <u>Adkins v. State</u>, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. <u>Cooper v. State</u>, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). When reviewing a defense attorney's actions, this Court may not use hindsight to second-guess counsel's decisions regarding trial strategy and tactics.

1.

The petitioner claims the trial court erred in denying his post-conviction petition. First, he claims the trial court erred in finding that trial counsel was effective in adequately conferring with the petitioner to develop trial strategy and witness preparation and that trial counsel's choices were informed and based upon adequate preparation. In support of this claim, petitioner cites to counsel's sole documented meeting with petitioner and counsel's failure to obtain the social security documents until after trial and sentencing.

Petitioner testified that he met with counsel on two occasions for a total of approximately thirty minutes. Trial counsel testified that he likely met with petitioner on several occasions as needed. However, counsel admitted that at the time he did not keep detailed records of time spent with clients. During the hearing, the trial court indicated such a claim would necessarily center around the credibility of the respective parties. The Court noted it was "highly improbable" that counsel only met with petitioner on one occasion. The Court noted a preliminary hearing and counsel's references to certain meetings with petitioner. In its ruling, the Court chose to believe the testimony of trial counsel. We find no basis to question the trial court's finding on this issue.

The record indicates counsel met with petitioner to discuss the allegations and any potential witnesses. Counsel said he tried to follow up on any known potential witnesses. He did not recall meeting with anyone named Gephart. Petitioner said Gephart had been accused of such acts by the same victim. However, petitioner admitted he had not seen Gephart in some time and had no information as to his present location. Counsel said he also discussed motive evidence with petitioner relating to the son-in-law's conduct and sudden move from the state.

Perhaps the largest area of concern raised by petitioner related to his decision to testify and the resulting examination. During petitioner's examination he essentially responded that he had never touched any of his daughters in a sexual manner. This "opening of the door" by petitioner permitted rebuttal testimony of petitioner's other daughter, who claimed petitioner did the same things to her. Petitioner said he did not know he was going to testify until the state finished its proof. When petitioner went to the back room with counsel, counsel told him he would be testifying.

6

Petitioner tried to suggest his low IQ inhibited his ability to testify and that had counsel adequately prepared him, he would not have "opened the door."

Counsel said it was known all along that petitioner would have to testify. He said the state had presented its case and without petitioner's testimony, no counter-veiling evidence would be presented to the jury. Trial counsel acknowledged not having petitioner's social security records until after the trial but noted he found no basis to suggest petitioner was unable to understand the proceedings. Petitioner admitted that counsel knew about the intelligence issue prior to trial when counsel asked petitioner why he received social security benefits. Petitioner said he told counsel he received benefits because he was not very smart.

The trial court noted the "opening the door" testimony and recalled the trial of this matter. The court found nothing to indicate petitioner was limited in his understanding of the proceedings. The judge said the petitioner was the "author of this predicament" in that he failed to directly answer the question. Had the petitioner answered the question directly posed to him, the Court concluded, this issue would never have arisen. Tied to this argument is petitioner's claim that the trial court erred in failing to request a jury-out hearing prior to the presentation of rebuttal testimony. The Court specifically stated that even if this was a deficiency on counsel's part (in failing to ask for a jury-out hearing), there was no resulting prejudice because he would have permitted the rebuttal testimony even had such a hearing been requested.

In its findings, the Court addressed the issue of the jury's relatively short deliberation period and noted he had witnessed longer deliberation and shorter deliberation but found no indication of deficiency in trial counsel's performance due to the deliberation period. The trial court similarly found nothing to indicate the petitioner's low IQ affected the proceedings or limited petitioner's understanding of the proceedings.

The trial court also touched upon petitioner's claim that trial counsel once said "all sex offenders should be castrated." Again, the trial court noted a credibility issue and resolved it in favor of trial counsel. The judge noted that trial counsel has represented a number of sex offenders in the past and also noted his belief that counsel never made the statement.

Viewing the record as a whole, in light of the trial court's findings, we conclude that the petitioner has failed to demonstrate that trial counsel's performance on this issue fell below the acceptable standard. Therefore, we find no merit to this first claim.

2.

Next, petitioner claims trial counsel was ineffective due to his decision not to call Tim Staley as a witness. The petitioner recognized that if he claimed counsel erred in failing to call a particular witness he must produce that witness at the post-conviction hearing. Petitioner must present a material witness who would have testified favorably in his behalf. Black v. State, 794 S.W.2d 752 (Tenn. Crim. App. 1990). "It is imperative that the witness testify and the petitioner offer evidence at the evidentiary hearing in order for the post-conviction court to determine the potential merit of

the evidence." Richard Stanley Russell v. State, No. 01C01-9707-CR-00302 (Tenn. Crim. App. filed Apr. 21, 1999 at Nashville) (citing Black, 794 S.W.2d at 755).

As summarized above, Mr. Staley testified that he resided with petitioner and his family for approximately fifteen years. He said the same victim accused him of molesting her during the time he resided in the home. However, he claimed the victim's claims were untrue. Staley said he went to a location alleged to have been the site of one or more molestation episodes and discovered it was an open field. Staley said he was never interviewed by trial counsel but conceded he had spoken with one of trial counsel's subordinates. Petitioner claimed counsel told him he would not call Staley because of Staley's weight and appearance. Trial counsel denied such claims and recalled the interviews with Staley. He noted that Staley could not give specifics of the alleged incidents and could not substantiate his claims. Therefore, counsel chose not to call Staley as a witness.

As noted by trial counsel and as evidenced from the testimony of Staley at the evidentiary hearing, Staley had limited specific information relevant to the instant case. It is reasonable that counsel would have chosen not to call Staley due to his general claims. Such tactical decisions will not be second-guessed by this Court. This claim is without merit.

3.

Finally, petitioner claims trial counsel was ineffective in failing to challenge the state's motion in limine and in failing to impeach the victim relating to a videotape of her appearance on the "Maury Povich Show." A significant portion of the hearing transcript relates to the purported Povich videotape. The record indicates the victim appeared on the "Maury Povich Show" along with petitioner after petitioner's ex-wife became aware of an upcoming taping of the show featuring teens addicted to sex. Trial counsel secured a copy of the tape and later gave it to the state. The state filed a motion *in limine* relating to the videotape. Petitioner claims the videotape could have been used to impeach the testimony of the prosecuting witness (petitioner's daughter). According to petitioner, the victim admitted she had lied about sexual activity.

Trial counsel recalled the specifics of the videotape and his production of the tape to the state in reciprocal discovery. Counsel did not recall that the tape was ever returned to him. However, he recognized potential problems with the tape. He did not want to create the impression to the jury that petitioner urged his daughter to appear on the show.

The trial court noted its concern about the missing tape. However, the court first recognized the admissibility issues surrounding the use of extrinsic evidence to impeach a witness. The court also said the tape created "a terrible problem." However, on the issue of deficient performance and prejudice, the court found that the decision not to introduce the tape was a tactical one. The court said counsel is "very competent in defending (these types of cases) and is also competent in determining what he should do and what he shouldn't do. I guess it's the classic, know when to hold them, know when to fold them." The Court concluded the decision not to use the tape was reasonable and found no deficiency.

8

This Court has reviewed the transcript of the hearing and the arguments of counsel. First, the Court notes the tape was not presented to the post-conviction court. For some reason the tape is no longer available. Therefore, much of the post-conviction court's analysis was based upon what he was told about the tape. The same difficulty arises here. Because the tape is not available, neither the trial court nor this Court can assess its evidentiary value, if any. If we assume the tape contained the statements alleged to have been made by the victim, the tape possibly held some impeachment value. However, as noted by the post-conviction court following the hearing, the tape's use as impeachment evidence was not unfettered. The evidentiary rules would have been applied to determine those portions admissible under the rules.

Further, the parties also recognized the tape could have cast the petitioner in a negative light if the jury believed the daughter appeared on the episode relating to drug and sex addictions at the behest of her father, the petitioner. With these consequences in mind, this Court agrees with the post-conviction court that the evidentiary value of the tape is, at best, unknown. Therefore, the post-conviction court did not err in finding counsel's tactical decision was sound. We similarly find trial counsel made a tactical decision which will not be disturbed on appeal.

The post-conviction court found petitioner had failed to prove the allegations by clear and convincing evidence. Viewing the record as a whole, we agree with the post-conviction court's findings. Accordingly, the judgment of the post-conviction court is hereby affirmed.


_____

J. S. Daniel, Senior Judge