IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 2, 2010

## DEMARIO TABB v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-03360      W. Mark Ward, Judge**

**No. W2009-01249-CCA-R3-PC - Filed June 11, 2010**

The petitioner, Demario Tabb, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief. Following a jury trial, the petitioner was convicted of two counts of first degree felony murder and one count of attempted aggravated robbery. He was subsequently sentenced to an effective life sentence without the possibility of parole. On appeal, the petitioner argues that he was denied his Sixth Amendment right to the effective assistance of counsel. Specifically, he contends that counsel was ineffective by failing to remain with the petitioner after a failed proffer session to ensure that he was escorted back to his cell in light of the fact that the petitioner gave an incriminating statement to police after counsel left. Following review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

Neil Umsted, Memphis, Tennessee, for the appellant, Demario Tabb.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Chris Lareau, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Factual Background

The extensive underlying facts of the case, as set forth on direct appeal, are as follows:

Rodrigo Ramirez and his wife, Floricelda Reynoso Ambrocio, relocated to the United States from Guatemala in order to raise their family in safety. In November 2002, Ramirez, his wife, and their two boys, ages four and six, lived at the Prescott Apartments in Memphis. At the time, Ambrocio was about seven months pregnant with the couple's third child. On November 10, 2002, Ramirez arrived home from work around 10:25 p.m. and, as he walked toward his apartment, he noticed that three black men were following him. After entering his apartment, Ramirez tried to close the door behind him; however, the three men were able to force their way inside. Each of the intruders had a gun. One of the men held a gun to Ramirez's head, demanded "Give me money," and began searching his pockets. Ramirez explained to the man that he had no money. Also in the apartment at the time was Maynor Gonzales, who was Ramirez's cousin. One of the other intruders held a gun to Gonzales while the third man stood close to the door. When the two children started crying, Ambrocio entered the room and attempted to pick them up, but they were too frightened to move. At this point, Ambrocio grabbed a shoe to strike the assailant who was attacking her husband, and one of the other men fatally shot her. The nineteen-year-old victim died before the ambulance could arrive. After the shooting, the three men immediately fled the apartment.

At trial, Ramirez, speaking through an interpreter, positively identified the [petitioner] as one of the three men who forced their way into his apartment. He testified, however, that he did not know which of the three men shot his wife, but he did not "think" it was the [petitioner] because he believed that the [petitioner] "was the one who was attacking [him]."

Several days after the shooting, Ramirez was shown a photographic lineup and identified Anthony Ware as one of the intruders. On November 13, 2002, Ware was taken into custody and informed police that the [petitioner] was one of the participants in the attempted robbery. He further stated that the [petitioner] was the person who shot Floricelda Ambrocio.

In May 2004, a Shelby County grand jury returned a three-count indictment charging both the [petitioner] and Ware with: (1) the first degree felony murder of Ambrocio, committed in the perpetration of an attempted robbery; (2) the first degree felony murder of the unnamed, viable fetus of Ambrocio, committed in the perpetration of an attempted robbery; and (3) criminal attempt to commit aggravated robbery.

At trial, Ware, testifying as a State's witness, stated that he had known the [petitioner] for about two years. He further testified that, on November 10, 2002, the [petitioner] asked him for a ride to pick up some money, which Ware assumed someone owed him. The [petitioner] instructed Ware to go to the Prescott Apartments and, on the way, Ware picked up an acquaintance, known only as Dillon. Upon their arrival, the [petitioner] instructed Ware to park at the back of the apartment complex and then led the way to the Ramirez apartment. According to Ware, the [petitioner] knocked on the door and pushed his way inside. Ware and Dillon stood by the door, about four feet from the [petitioner]. The [petitioner] went over to one of the men and demanded money. The [petitioner] pulled out a revolver and held it to the man's head, and their conversation became "aggressive." A woman ran out from the back of the house, and the [petitioner] shot her. Ware ran out the door, and they met back at his car. Ware testified that Dillon had a black cell phone in his hand and that the [petitioner] was the only one with a gun. Ware stated that he did not know the [petitioner] was going to rob the man and that he told the [petitioner] and Dillon "it was messed up." Ware estimated that the shooting took place around 10:00 p.m.

. . . .

In defense, the [petitioner] called two witnesses, Deandra Wright and LaCurtis Waller. Wright testified that Ware told him that he did not even know the [petitioner] and, furthermore, [did not] know why the [petitioner] was charged with the crimes at the Ramirez residence. Waller testified that he had known Ware about six years because they were from the same "neighborhood." Waller further testified that around 11:00 or 12:00 p.m., on the evening of November 10, 2002, he was at Rico Hill's residence when Ware and another man, known only as "Big D," dropped by. Waller stated that "Big D" and the [petitioner] are not the same person. Waller testified that Ware told him that he and Mario Fields, a.k.a. "Tiny," had just "went in [a] house to rob, . . . the man," and when the man's wife came out, she tried to grab Tiny, and Tiny shot her. Waller explained that Ware told him that he had "dropped off" Tiny before arriving at Hill's residence. Waller stated that Ware never mentioned that the [petitioner] was present during the attempted robbery and shooting.

Waller was later charged with several robberies, and, during one of his court appearances, he encountered Ware in the courtroom where the two talked. Ware said he was housed in the same "pod" with the [petitioner] and

asked about the case. Waller explained that Ware told him that he used to buy marijuana at the Ramirez residence and that he and Fields had decided to rob the man. According to Ware, the man's wife tried to grab Fields, Fields shot her, and they fled. Ware told Waller that he did not know the [petitioner] but that he "[was] not going to take no time for this [charge]" and, "to dodge this," he was "going to tell them [the petitioner] did it."

In rebuttal, the State called Sergeant Sharon Mabon who testified that she was working in the Homicide Bureau of the Memphis Police Department at the time of the investigation of the Ambrocio homicide. The [petitioner] contacted her several times while incarcerated and wanted to provide information about the shooting and attempted robbery. On November 23, 2004, at a scheduled meeting at the jail, Mabon interviewed the [petitioner].

Mabon testified that the [petitioner] told her that, on the night of the shooting, he was near the Prescott Apartments and saw Ware's car. According to the [petitioner], he had known Ware about four years. On that night, the [petitioner] wanted to buy some "weed," and Ware offered to drive him to get some. Mario Fields was already in Ware's car, and the three of them went to the Prescott Apartments. The [petitioner] gave Ware the money for the "weed," and Ware led them to the Ramirez apartment. Ware walked in the house first, followed by Fields, and then the [petitioner]. Ware pulled out a black automatic and put it to a man's head, and Fields pulled out a revolver and pointed it at the man as well. The female victim tried to help her husband, and Fields shot her. Fields pulled the phone cord out of the wall, and then they all ran back to the car, at which point Ware told Fields that he should not have shot the lady.

*State v. Demario Tabb*, No. W2005-02974-CCA-R3-CD, 2007 WL 2700075, at **1-3 (Tenn. Crim. App. at Jackson, Sept. 14, 2007). Following a five-day jury trial, the petitioner was convicted of two counts of first degree felony murder and one count of attempted aggravated robbery. *Id*. He was subsequently sentenced to two terms of life without parole and five years for the respective convictions. *Id*. The trial court further ordered that all sentences were to be served concurrently, resulting in an effective sentence of life without the possibility of parole. *Id*. The petitioner filed a direct appeal, challenging the trial court's denial of his motion to suppress his statement, the State's use of the statement in rebuttal, and a curative instructive given. After review, this court affirmed the convictions. *Id.*

Subsequently, the petitioner filed a *pro se* petition for post-conviction relief, alleging, among other issues, that he was denied his right to the effective assistance of counsel.

Following the appointment of counsel, an amended petition was filed. A hearing was then held at which the petitioner and two of the attorneys who represented him testified. The petitioner testified that he was represented by three separate attorneys prior to the conclusion of his case. As his interaction with the second attorney ("counsel") serves as the petitioner's sole basis for his claim on appeal, we set forth only the facts testified to regarding that representation.

The petitioner testified that counsel met with him on only one occasion, told the petitioner that he should expect to get "some time," and refused to file motions requested by the petitioner. According to the petitioner who had been in custody for approximately two and one-half years at the time, he and counsel met and discussed his giving a statement to the police. The petitioner stated that counsel wanted him to incriminate a third person in hope of getting a deal. On the day the statement was scheduled, the petitioner was brought to the police station, and he and counsel met in an interview room. The petitioner testified that he felt like counsel was forcing him to give a statement to police. As a result, the petitioner informed counsel that he would not make a statement. At that point, according to the petitioner, counsel stated he did not want to represent the petitioner and left the room. Afterward, detectives entered the room and read the petitioner his rights. He stated that one detective tried to call counsel, but counsel refused to return. The petitioner acknowledged that he had specifically been advised of his right to counsel and affirmatively waived the right. The petitioner testified that the detective informed him that, with no attorney present, the only way to get a deal was to give a statement. As a result, the petitioner gave an incriminating statement to the detectives, admitting his involvement in the crime. The petitioner also testified that counsel continued to represent him until such time as his family could retain new counsel.

Counsel also testified at the hearing and stated that he had taken over the petitioner's representation from previous counsel. He stated that this was a "no deals" case and that he was desperately trying to arrange a deal because the State did not believe the petitioner was the shooter. Counsel stated that he sought multiple continuances in hope of setting up a proffer meeting with detectives to allow the petitioner to give a statement. On the day the meeting was scheduled, he met with the petitioner at the jail and explained to him the mechanics of the proffer. Counsel stated that he encouraged the petitioner to tell the truth regarding the incident. At this point, the petitioner stated that he did not want to be there and that he felt counsel was forcing him to give the statement. Counsel stated that he explained that, if the petitioner felt that way, they had a conflict and that he could not continue the representation. Counsel then left the interview room, informed the detective that a conflict had arisen, and stated that there would be no statement given that day. According to counsel, he did not specifically tell the detective to refrain from further questioning of his client. Counsel then left the police station and attempted to locate the prosecuting attorney and the

trial judge to inform them of his need to withdraw. Counsel testified that when he left, he was under the impression that the petitioner would not be questioned further, that no statement would be taken that day, and that the petitioner would be returned to his cell. Counsel was surprised to later learn that a statement had been given. According to counsel, he continued to represent the petitioner for a few more days until retained counsel could take over the case. He specifically testified that he did no other work on the case.

After hearing the evidence presented, the post-conviction court denied the petitioner's request for post-conviction relief. This timely appeal followed.

**Analysis**

On appeal, the petitioner raises the single issue of ineffective assistance of counsel. Specifically, he contends that the post-conviction court "erroneously ruled that counsel was effective when he arranged a proffer session with homicide detectives and left [the petitioner] without representation while [the petitioner] provided a statement used to rebut his defense theory." To succeed on a challenge of ineffective assistance of counsel, the petitioner bears the burden of establishing the allegations set forth in his petition by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). The petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the petitioner must establish (1) deficient performance and (2) prejudice resulting from the deficiency. The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). This deference to the tactical decisions of counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

It is unnecessary for a court to address deficiency and prejudice in any particular order or to address both if the petitioner makes an insufficient showing on either. *Strickland*, 466 U.S. at 697. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999) (quoting *Strickland*, 466 U.S. at 694).

The issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact. *Id*. at 461. "[A] trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed on appeal under a *de novo* standard,

accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). However, conclusions of law are reviewed under a purely *de novo* standard with no presumption.

As noted, the petitioner contends that the post-conviction court erred in denying his petition because "the integrity of the adversarial process was undermined when counsel left [the petitioner] without representation while [the petitioner] provided a statement to detectives that was used to rebut his defense theory." According to the petitioner, counsel was deficient by arranging the proffer session, leaving the petitioner alone with investigators without his assistance, failing to specifically direct the detective not to speak with his client, and failing to ensure that the petitioner was escorted back to his cell without harassment. He further contends that the post-conviction court erred in finding no prejudice. He contends that the only evidence linking the petitioner to the crimes was the "questionable" identification of the victim's husband, the co-defendant's "incredible" testimony which was not consistent with the remaining proof, and the petitioner's own statement. According to the petitioner, the State was allowed to introduce his statement which discredited his entire defense and established a *prima facie* case of felony murder. In denying relief, the post-conviction court, in a written ruling, stated:

> [A]s a factual finding, I find that [the petitioner] initiated this desire to make a statement and the meeting was arranged and there was a conflict that [arose] between the [petitioner] and his attorney at that meeting as to what should be taking place and how the statement should be given. And due to that conflict the decision was made by the defense attorney not to make the statement. And because of pressure, the defense attorney was feeling pressure from his client who was claiming to be pressured by the defense attorney. So he decided that he might have to withdraw from the case.
>
> So he left and advised the officers that there would be no statement given that day. At the time he left, the [petitioner] had indicated that he did not want to make a statement. Thereafter, the police must have questioned - - they did question him and he decided to make a statement.
>
> With regard to this particular scenario, I don't really find any deficient performance; certainly not performance as a defense attorney that's below the range of reasonable competence of attorneys. I just don't find any deficient performance. I guess the claim is made that a competent attorney would have stayed in the room until they escorted him down to the jail. But I don't think that is something that is required of attorneys. And I don't think that the

actions of [counsel], in this particular case, fell below the range of reasonableness of attorneys. . . .

. . . .

And, quite frankly, when you look at the co-defendant's statement and the eyewitness identification, I'm having a hard time finding that the result of the trial would have been different even without the statement. So I'm showing that both prongs under *Strickland versus Washington* have not been satisfied with regard to [counsel's] conduct.

In support of his argument that he was entitled to relief, the petitioner relies upon *Sepulveda v. State*, 90 S.W.3d 633 (Tenn. 2002), in which counsel was found deficient when he allowed his client to meet with investigators without his supervision or assistance. However, a reading of *Sepulveda* illustrates that it is factually distinguishable. In that case, the attorney, on multiple occasions, allowed his client to meet with law enforcement agents completely unsupervised by his presence. The meetings in that case resulted in multiple statements and in the defendant taking a polygraph test. That is not the case before us now. Counsel was present for the scheduled meeting with the petitioner and police. He met with the petitioner alone and explained the process to him. Based upon his belief that a conflict of interest existed, counsel left only after the petitioner indicated that he felt that counsel was forcing him to give a statement. Moreover, counsel informed detectives that "no statement would be given" on that day. We, like the post-conviction court, must conclude that this was reasonable behavior on counsel's part. He was not required to remain with his client until he was returned to jail, especially in light of the fact that the petitioner was insisting that he would not be giving a statement to police. Likewise, we are unable to conclude that the record preponderates against the post-conviction court's finding that the petitioner failed to establish prejudice based upon the evidence presented at trial. The record indicates that the petitioner, who had multiple previous experiences with the criminal justice system, was advised of his right to have an attorney present but chose to waive that right.

Indeed, based upon the previous opinion written by this court on the direct appeal of the case, the issue of prejudice has essentially been predetermined as it was concluded that the petitioner's rights to counsel and against self-incrimination were not violated during the taking of the statement. The court noted that the evidence established that the petitioner "initiated contact with the police," "made a voluntary and knowing waiver of his constitutional rights," and "was aware he had a right to have an attorney present." *Demario Tabb*, No. W2005-02974-CCA-R3-CD. Moreover, the petitioner himself acknowledged that he was informed of his rights prior to the giving of the statement. Thus, we must conclude that the petitioner has failed to establish his entitlement to relief in this case.

## CONCLUSION

Based upon the foregoing, the denial of post-conviction relief is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE