# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 12, 2011

## JASON KAYSER v. STATE OF TENNESSEE

**Appeal from the Weakley County Circuit Court**
**No. 2010-CR35    William B. Acree, Jr., Judge**

---

**No. W2010-02234-CCA-R3-PC  - Filed September 26, 2011**

---

The Petitioner, Jason Kayser, appeals the Weakley County Circuit Court's denial of post-conviction relief from his conviction upon his guilty plea for second degree murder, a Class A felony, for which he is serving seventeen years as a violent offender. The Petitioner contends that he did not receive the effective assistance of counsel in connection with his guilty plea and that his plea was not knowingly, voluntarily, and intelligently entered. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Danny H. Goodman, Tiptonville, Tennessee, for the appellant, Jason Kayser.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Tommy A. Thomas, District Attorney General; and Kevin McAlpin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

According to the transcript of the guilty plea hearing:

> The facts of the case are that on or about April the 11th, 2008, [the Petitioner] was living with the victim, April Kayser. She was 30 years of age. The evening before that, he hit [the victim], according to his statement, that there was an argument, that he was accusing [the victim] of seeing another man and that he hit her several times about the body, also about the head.

There is no evidence of a weapon being used. Perhaps he kicked her; it's not really known, but he struck her, he did strike her several times. Again, according to his statement, that she went to bed late that night or early the next morning. At the time he thought that there were no life-threatening injuries; according to his statement, he had nothing that indicated they were.

The next afternoon, sometime the next afternoon, he realized, I think maybe through conversations with his – their children and also checking on her, that she was not responsive. He did take her to the Volunteer General Hospital. From there she was sent to – by Air Evac to Vanderbilt Hospital when it was determined she had a closed-head injury. Again, at that time, she was unresponsive. She was left on life support for six days, where it was determined from the doctors that she was not going to recover, life support was discontinued, and she died on April the 17th of 2008.

The autopsy was performed on the following day, April 18, 2008 from the Tennessee State Medical Examiner's Office. Autopsy indicates that she had multiple bruises all over her body, some old, some new, from – literally from the bottom of her legs up to the top of her head. The cause of death was determined in the autopsy as being multiple blunt force injuries. There were – the primary injury was to the brain where there was a hemorrhage at the back part of the brain that caused – there was already severe bleeding on the brain, that being the cause of death.

Again, the [Petitioner] admitted to the cause of the injuries. Also, he admitted during his statement that he had struck her in the past and, therefore, pursuant to the second degree murder statute he did knowingly kill [the victim].

The transcript of the plea hearing reflects that the Petitioner affirmed his understanding of the nature of the charge, the range of punishment, that the sentence would not include the possibility of early parole but would allow for early release for "good time," and the possible fine. The Petitioner acknowledged his understanding that he was waiving his rights to a jury trial and an appeal by pleading guilty, to confront and cross-examine

witnesses, and not to incriminate himself. The Petitioner also affirmed that he understood the conviction could be used to enhance his punishment for any later conviction. The Petitioner agreed that the facts of the crime stated by the district attorney were true. He professed that his attorney had advised him about the guilty plea and that he was satisfied with trial counsel's representation. The trial court found that the Petitioner's guilty plea was made "voluntarily, intelligently and freely," accepted the plea, entered the judgment of conviction, and sentenced the Petitioner accordingly.

The Petitioner filed a pro se post-conviction petition alleging that trial counsel was ineffective and that he did not enter a knowing, voluntary, and understanding guilty plea. Counsel was appointed. The petition was amended, but the issues remained the same.

At the post-conviction hearing, the Petitioner testified that for about a year, he was represented by appointed counsel in the conviction proceedings. His family retained trial counsel, the attorney whose assistance he alleged was ineffective, about two months before he entered his guilty plea. He said that counsel visited him about four times but never discussed the facts of the case or possible witnesses. He said counsel discussed plea offers that had been conveyed from the State. He did not recall the crime that was the subject of the plea offers and said he and counsel never discussed how second degree murder was defined. He said he did not know before entering his plea that each element of a crime must be proven. He said that he and counsel discussed the victim's psychiatric history and that trial counsel advised him that the information "would have to come out" during a trial.

With respect to the elements of second degree murder, the Petitioner denied that he knowingly killed the victim. He did not recall whether he discussed this with trial counsel. He denied telling counsel that he knowingly killed the victim. He said he would not have entered a plea if he had known he was admitting a knowing killing. He also denied that he unlawfully distributed a Schedule I or Schedule II drug that caused the victim's death and that he ever discussed this with counsel. He said the cause of the victim's death was blunt force trauma to the head. He said he had never been charged with assaulting the victim, nor had he engaged in domestic abuse toward her. He acknowledged, "I did slap her one day," but said it was the only time he ever hit the victim. He denied engaging in multiple incidents of domestic abuse, assault, or infliction of bodily injury to the victim. He said he and trial counsel never discussed this element of second degree murder, even though it was part of the charged offense. He said counsel never asked him if he had hit the victim or had been convicted of domestic assault. He denied knowing when he entered the plea that he was admitting multiple incidents of domestic abuse and said he only learned he had done this on the day of the post-conviction hearing. He again denied that he would have pled guilty if he had known the elements of the offense. He said he did not remember the prosecutor's

statement on the record at the guilty plea hearing that he admitted causing the victim's injuries and striking her in the past.

The Petitioner testified that he did not remember if there were witnesses he wanted trial counsel to interview. He said that he asked counsel to investigate the victim's psychiatric records but that counsel failed to do so. He said he thought the records would have helped the defense because the victim had been diagnosed with bipolar disorder and became abusive. He said this evidence was never provided to the district attorney's office.

The Petitioner testified that he was taking Zoloft, Depakote, and Buspar while he was in jail and when he entered his guilty plea. He said he began the medications two to three months after he was jailed. He said he had not gone to a medication management appointment for about six months because the jail "cut it off" and did not want to pay for it. He claimed he was given a reduced amount of Depakote but did not know how long he received the improper dosage. He said Depakote was a mood stabilizer but was primarily used for seizures. He said that when he was transferred to a Department of Correction facility, a blood test revealed that he was not receiving a therapeutic level of Depakote. He attributed his "trouble thinking clearly and . . . mind just racing constantly" to the low dosage. He said that after the blood test, his dosage was increased from 250 milligrams to 1500 milligrams per day. He said that he was still taking 1500 milligrams per day and that he had taken 2000 milligrams at one point. He said that the medication "slow[ed] everything down to where I can comprehend." He said that when he was not taking it, his mind raced, he could not accomplish anything, and he could not concentrate when someone spoke to him. He said this was his state of mind when he entered his guilty plea.

On cross-examination, the Petitioner was asked whether he understood at the guilty plea hearing the rights he was waiving and responded, "To an extent, I think I did." He said he was not aware that multiple assaults or acts of domestic violence could support a finding of a knowing killing. He said that he slapped the victim one time weeks before her death. He said that there were "several occasions where I had to hold her down" and that they were trying to get help. When asked about the statement in his post-conviction petition that he and the victim sometimes fought, he said that most of the time he held the victim to keep her from hurting either of them.

On redirect examination, the Petitioner testified that the injuries with bruising and scratching referred to in his post-conviction petition were not from his assaulting the victim. He said the victim would get upset and he would only defend himself to keep her from hitting him. He denied that he hit the victim other than slapping her once and that there were multiple incidents of domestic assault.

Trial counsel testified as a State's witness that the Petitioner's family retained him and that he represented the Petitioner from December 17, 2008, until June 25, 2009. He said he discussed the element of second degree murder involving the inference of a knowing killing from multiple incidents of abuse. He said that he provided the discovery materials to the Petitioner on December 31, 2008, and that they discussed that the witnesses would likely testify in accord with their statements about prior abuse. He believed he told the Petitioner that the problem with the defense was the evidence of prior abuse. He said the Petitioner told him multiple times that the Petitioner wanted the plea offer to involve a fifteen-year sentence. Trial counsel said that at first the offer was for a nineteen-year sentence. He said that when the State offered a seventeen-year sentence, the Defendant accepted the plea bargain.

Counsel testified that the Petitioner's testimony was inaccurate regarding a lack of discussions about the facts of the case or potential defense witnesses. He said he told the Petitioner that presenting defense witnesses would be important. He said he and the Petitioner reviewed the facts, the statement, and the sentence length and service requirement. He said he never saw the Petitioner have difficulty understanding their communications. He said that he thoroughly reviewed the Petitioner's rights that were waived by the guilty plea and that he thought the Petitioner understood. He said their conversations "almost always boiled down to fifteen years."

Counsel testified that the Petitioner claimed he was not getting the correct medication dosage. Counsel said he spoke with jail personnel and was told that the jail personnel would investigate the claim but that they believed the dosage was proper. He said the Petitioner's parents called him around the same time as the Petitioner's complaint. He said the Petitioner did not express concern about the medication dosage again. Trial counsel said his file reflected that he went to the jail to visit the Petitioner about six times and that another lawyer from his office went one other time.

Counsel testified that before he was retained, the Petitioner had a mental evaluation and was determined to be competent to stand trial. He said he filed a motion for change of venue due to pretrial publicity that was denied.

On cross-examination, trial counsel testified that there were statements from the victim's coworkers about the victim's claims of prior abuse. He did not recall any eyewitnesses to the prior abuse. He said he explained to the Petitioner the possibility of a hearsay exception for the victim's statements. He acknowledged that the other lawyer from his office who visited the Petitioner at the jail once was the attorney present in court when the Petitioner entered his plea. He said, however, he had discussed everything with the Petitioner beforehand.

Counsel admitted that he would be concerned about the Petitioner's ability to enter a guilty plea if the Petitioner had expressed concern about the medication dosage. He said he remembered reviewing the report of the Petitioner's mental evaluation. The transcript of the guilty plea and the report of the mental evaluation were received as exhibits.

The trial court filed an order in which it found "no competent evidence" that the Petitioner's medication dosage was incorrect or that the medication affected the Petitioner's ability to understand and accept the guilty plea. The order also states the court's finding that the transcript of the guilty plea hearing demonstrated that the Petitioner knowingly and understandingly entered his plea. The court also found "no evidence" that trial counsel failed to investigate the case properly. The trial court's findings implicitly reflect that the trial court accredited trial counsel's testimony and discredited the Petitioner's conflicting testimony. The trial court denied relief. This appeal followed.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2006).

**I**

The Petitioner contends that his guilty pleas were not knowingly, voluntarily, and intelligently entered because he was not given the proper dosage of his medication and because he did not understand the elements of the offense. The State counters that the trial court correctly found that the Petitioner failed to prove this claim. We agree with the State.

When evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court has held that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970). The court reviewing the voluntariness of a guilty plea must look to the totality of the circumstances. See State v. Turner, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). The circumstances include:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was

represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (citing Caudill v. Jago, 747 F.2d 1046, 1052 (6th Cir. 1984)). A plea resulting from ignorance, misunderstanding, coercion, inducement, or threats is not "voluntary." Blankenship, 858 S.W.2d at 904.

The record reflects that before the guilty plea, trial counsel explained the elements of the offense to the Petitioner and discussed the facts and defense strategy, and that their conversations always returned to the Petitioner's desire for a fifteen-year sentence. The transcript of the guilty plea hearing reflects that the Petitioner acknowledged his understanding of the offense, his rights, his satisfaction with trial counsel, and his desire to plead guilty. At that hearing, the Petitioner also agreed that the facts recited by the State were accurate. In denying post-conviction relief, the trial court found that the Petitioner's testimony was not credible, and the Petitioner did not present any other proof to support his claim that he was improperly medicated or that the medication dosage he was given prevented him from entering a knowing, voluntary, and intelligent guilty plea. The record does not preponderate against the trial court's determination that the Petitioner understood the plea agreement and that he entered a knowing, voluntary, and intelligent guilty plea. The Petitioner is not entitled to relief.

**II**

The Petitioner also contends that he did not receive the effective assistance of counsel because trial counsel did not adequately advise him about the elements of second degree murder and did not ensure that the Petitioner was receiving proper medication before allowing the plea agreement to go forward. The State contends that the trial court did not err in finding that the Petitioner failed to prove his claim. We agree with the State.

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the Petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland

standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner to show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." Id. When a petitioner pleads guilty, he must show a reasonable probability that, but for the errors of his counsel, he would not have pled guilty. See Hill v. Lockhart, 474 U.S. 52, 59 (1985); Adkins v. State, 911 S.W.2d 334, 349 (Tenn. Crim. App. 1994).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were "within the range of competence demanded of attorneys in criminal cases." Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Baxter, 523 S.W.2d at 936. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See DeCoster, 487 F.2d at 1201; Hellard, 629 S.W.2d at 9.

As we have discussed, the trial court discredited the Petitioner's testimony and accredited the State's proof that trial counsel advised the Petitioner of the elements of the offense and consulted with the Petitioner about the case. The record contains proof that trial counsel had no reason to doubt the Petitioner's competency to enter the guilty plea, that counsel was aware of the prior mental evaluation in which the Petitioner was found competent for trial, and that the Petitioner failed to mention any ongoing issues with his medication after trial counsel spoke with jail personnel. The trial court's findings implicitly discredited the Petitioner's testimony, and the Petitioner did not present any proof aside from his own testimony that the medication dosage was incorrect or that the dosage was

inadequate to address any mental health concerns.  We conclude the evidence does not preponderate against the trial court's findings.  The trial court properly concluded that the Petitioner failed to prove his ineffective assistance of counsel claim.  The Petitioner is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE