# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 1, 2012

## MICHAEL STEWART v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 08-02042     J. Robert Carter, Judge**

---

**No. W2012-00622-CCA-R3-PC  - Filed January 23, 2013**

---

The Petitioner, Michael Stewart, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his 2008 conviction for destruction or interference with utility lines and his three-year, three-month sentence. On appeal, the Petitioner contends that counsel provided him the ineffective assistance of counsel (1) by failing to object to hearsay statements and (2) by failing to obtain a Memphis Light, Gas and Water incident report. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

Neil Umsted, Memphis, Tennessee, for the appellant, Michael Stewart.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Betsy Weintraub, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This court summarized the facts of the case in the Petitioner's appeal of his conviction:

> Officer Donald Wicks of the Memphis Police Department testified that he was driving in his patrol car when he saw Stewart "chopping at a utility pole with an instrument in his hand." This sighting occurred around 2:30 p.m. on December 2, 2007. Officer Wicks said he "observed [Stewart] for a few

seconds and he was continuously chopping at the pole." Officer Wicks testified that Stewart used a tool which looked like "a jack-handle type instrument." Officer Wicks approached Stewart and asked what he was doing. Stewart responded that a baby was locked in a car, and he needed wire to unlock the door. Officer Wicks testified that no one was in the immediate area, so he did not investigate Stewart's claim about the baby. Officer Wicks did notice that a "line leading from the pole had been cut." He did not recall, however, whether the wire was still attached to the pole. Stewart was placed in the patrol car, and several other officers were called to the scene.

Scott Locke, an agent for the Memphis Light, Gas and Water division, testified that he responded to a call regarding the damaged utility pole. Locke inspected the pole and determined the pole's grounding wire was damaged and no longer functional. The wire was still attached to the pole, but it was flattened and pulled. Locke said the wire was made of copper, and valued at $4.00 per pound. Steward attempted to cut a two-foot section of the wire that was probably worth about $6.00. Locke testified that he spoke with Stewart, who was detained in a patrol car. Stewart said he needed the wire to help a woman break into her car. Later, Locke testified that Stewart "didn't say anything about a baby, or a woman, he just needed a stiff piece of wire to break into a car."

Rena Davis testified that on the afternoon of Stewart's arrest, she was driving in her car with her two-year-old grandson. Her grandson was secured in a car-seat in the back seat of her car. Her tires needed air, so she stopped at a laundry mat that had an air dispenser. She turned off the engine, but accidently left the keys in the ignition. Davis stepped out of her car and closed the door. She then realized that she had locked herself out of the car. Davis tried to get her grandson to unlock the car, but she was unsuccessful. She did not have access to a phone. Davis estimated that she stood outside of her car for about twenty minutes before another car pulled up to use the air dispenser. Davis said Stewart stepped out of the car. She explained her situation to him, and he offered to help. Stewart went into the laundry mat, and he returned with a hanger which

-2-

he used to try to unlock the door. Stewart was not able to open the door, so he went back into the laundry mat. He returned with a thicker hanger, but he still was unable to unlock the car. Davis estimated that Stewart spent twenty to twenty-five minutes trying to open the door. Stewart then walked away from the laundry mat without saying where he was going or whether he was coming back. Davis assumed he would return because his car was still parked near the air dispenser; however, Stewart did not return. Davis eventually found someone with a phone, and she contacted her daughter. Her daughter had a spare key, and she was able to unlock the car.

Davis said she felt her grandson was in danger. Her car was parked on a small slope and her emergency brake was not on. Davis said she worried that her grandson would get out of his car-seat and set the car in motion. Nonetheless, Davis testified that she did not believe her grandson was in "physical danger." She did not recall acting frantic or upset during the incident or telling Stewart that she was afraid of what might happen. Davis said her windows were rolled up, but the inside of her car "wasn't too hot, or too cold." She chose not to break a car window because she worried her grandson might be harmed by the glass.

Stewart testified that he stopped at the air dispenser because one of his tires was low. He immediately noticed a woman standing next to the air dispenser talking to a baby inside of her car. The woman had locked herself out, and she was trying to get the baby to open the door. Stewart offered to help the woman, and he went into the laundry mat to find a hanger. The first hanger he found was too thin, so he returned to the laundry mat and found a thicker hanger. Stewart was still unable to unlock the car. Stewart said he told the woman that he was going to a nearby filling station to find help; however, in looking down the street, he noticed a wire hanging off a utility pole. Stewart believed he could unlock the car with the wire, so he went to his car and got his jack-iron. Stewart began striking the wire with the jack-iron when he was spotted by the police. Stewart said he told the officer that he needed the wire to rescue

a baby who was trapped in a nearby car. The officer did not, however, investigate his claim.

Stewart was asked whether he thought the child was in danger. He responded:

> Well, I've got several grandkids, myself and I didn't know it was her grand-baby, I thought it was her baby, so I just went into the Superman mode and went to try to help, that's all I did. That's all I did, I just started trying to help her off the top of my head. I wasn't thinking of nothing.
>
> No, I didn't think the baby was in any danger, I just wanted to get the child out, you know. I was just helping, you know.

Stewart denied that he was trying to steal copper. He stated, "I was just thinking about getting the kid. The thought of doing something wrong was not in my mind at that time." Stewart did, however, say that during the incident, he thought the baby "was in a dangerous situation." Stewart admitted that he damaged the utility pole by striking it with his jack-iron.

State v. Michael Stewart, No. W2008-02680-CCA-R3-CD, slip op. at 1-3 (Tenn. Crim. App. Feb. 26, 2010).

At the post-conviction hearing, counsel testified that he was employed by the Shelby County Public Defender's Office and that he represented the Petitioner at the trial. He said the Petitioner waived his right to a jury trial and that a bench trial was held. He said that although he did not recommend a jury trial or a bench trial to the Petitioner, he advised the Petitioner of his right to a jury trial, his right to waive that right, and his right to a bench trial. He said the Petitioner told counsel of his desire to have a bench trial during his arraignment. He said the Petitioner wanted a bench trial because the Petitioner believed the case would have been resolved quicker than if a jury trial was held.

Counsel testified that the Petitioner's main defenses were duress and necessity and that the Petitioner never denied attempting to remove the copper wire from the utility pole. He said the Petitioner claimed that he attempted to remove the wire to help a woman unlock her car because her grandchild was locked inside. He recalled that the woman feared the car

-4-

would roll out of the parking lot and harm the child and that the Petitioner was anxious to open the door. Counsel said the defense theory was that the Petitioner acted under duress because the Petitioner believed the child was in distress and that he needed to open the door.

Counsel testified that he did not recall discussing with the Petitioner the extent of the damage to the utility pole. When asked if he recalled the Petitioner's telling him that the Petitioner hit a horseshoe ring securing the wires to the pole instead of the wires, counsel said that sounded familiar. He denied considering an argument involving an incomplete crime due to a lack of damage to the pole and said he focused on the duress and necessity defenses. He said the damage to the pole was not a "big issue" at the trial.

Counsel testified that he did not recall the Petitioner's asking him to obtain a copy of the Memphis Light, Gas & Water (MLG&W) incident report regarding the damage to the utility pole. He agreed that at the trial, Scott Locke testified that he worked for MLG&W and that he inspected the pole at the scene for damage. He agreed Mr. Locke testified that with regard to whether the pole was functional, Mr. Locke "thought at first that it was, but when the repair crew got there they said that it was not functional. I'm not an engineer. They came in and determined that it was not functional and had to be replaced." Counsel agreed the testimony contained inadmissible hearsay and said he did not object to the statement. He did not recall a tactical decision for his not objecting and said the statement was material because the State was required to prove that the Petitioner knowingly tapped, cut, burned, broke down, injured, destroyed, interrupted, or interfered with the current lines, cables, poles, power fixtures, or appliances utilized to furnish a service to the general public. He stated that he did not recall reviewing Mr. Locke's report and that the report was not in his file. The report was received as an exhibit, which showed Mr. Locke concluded that "[t]he damage to the grounding wire was minimal, and need[ed] no repair, and there was no actual theft of property."

Counsel testified that according to his notes, he and the Petitioner met four times before the trial and that the Petitioner testified at the trial. He said they discussed the reasons for the Petitioner's attempting to remove the copper wire before the trial.

On cross-examination, counsel testified that with regard to Mr. Locke's hearsay statement during the trial, he did not have any reason to doubt the truth of the statement. He agreed that had he objected on hearsay grounds, the court would have sustained the objection, and the State would have been permitted to call as witnesses the engineers who told Mr. Locke the utility pole was no longer functional. He agreed Mr. Locke saw the damage to the pole.

Counsel testified that the MLG&W incident report stated that the Petitioner attempted to take a piece of grounding wire from the utility pole and that the Petitioner told the police officer he had "done this before" that day. He said that the report might have been damaging to the Petitioner's case but that it was unclear what "done this before" meant. He agreed the report stated that the damage was minimal and said the amount of damage was not his focus. He said he focused on the defense of duress and necessity. He based the theory of defense upon the Petitioner's version of events. Upon examination by the trial court, counsel agreed that he presented as a witness the woman whose grandchild was locked inside her car.

The Petitioner testified that he allowed counsel's experience and professional judgment to determine whether duress and necessity defenses were appropriate. He said he told counsel that he knew pulling on the wire attached to the utility pole would not damage the pole. He said that children played with the wire daily after school and that the plastic stripping was already torn. He said that the copper wire stuck out from the stripping and that he never would have noticed the wire otherwise.

The Petitioner testified that he went to a nearby laundromat obtain a clothes hanger to unlock the door but that they did not have any. He said that as he was driving from the laundry mat to a convenience store, he saw the wire sticking out. He said that when he saw the police officer, he asked for a "slim-jim" to get the child out of the woman's car and that he thought the child was in danger "for a moment." He said that it was cloudy outside but not raining that day. He said the woman was hysterical because her grandchild was crying. He said the woman attempted to talk the child out of his car seat, but the child cried. He said that the woman attempted to calm the child and that he attempted to calm the woman. He said counsel explained to him the duress and necessity defenses.

The Petitioner testified that his statement to the police that he had "done this before" meant that he had unlocked cars with clothes hangers before that day. He said that he explained the facts to counsel and that he did not feel confident in the duress and necessity defenses because he knew he did not damage the utility pole. He asked counsel to request the MLG&W incident report to confirm his not damaging the pole and said counsel never requested the report. He agreed he wanted counsel to present evidence that he did not damage the pole. He said that although he hit the "horseshoe ring," he did not hit the wire. He said the ring was mounted to the pole and held the wire. He said he used a jack iron from his Jeep Cherokee to strike the horseshoe. He said that although he explained to the police officer that he was attempting to "save a child," the officer accused him of attempting to steal copper wiring. He said that although counsel did not request the incident report from MLG&W, he relied on counsel's advice in choosing a defense.

The Petitioner testified that he requested a bench trial because he believed the case would be resolved quickly. He said that he had custody of his twelve-year-old son and that he needed to be home for his son. He understood he had a right to a jury trial. He said that counsel prepared him for the trial by telling him to tell the trial judge "exactly what happened, how [he] felt the child was in danger, that [he] was there trying to do a noble act." He said counsel reviewed with him before the trial the questions he would ask at the trial.

The Petitioner testified that he requested counsel to argue at the trial that the crime in which he was charged was not completed. He said counsel did not "follow through" on the things the Petitioner requested. He said that although counsel was human, counsel made errors and that the Petitioner attempted to prove he did not do anything wrong. On cross-examination, the Petitioner stated that he did not mention the MLG&W incident report in his petition for relief.

Upon examination by the trial court, the Petitioner testified that he explained to counsel when he began his representation that his actions were based on a young child being locked inside a car. When asked why the Petitioner did not break the car window with the tire iron, he explained that he did not want the woman to have to pay an expensive repair bill. He did not think the woman had the money to repair a broken window. He said he was in confinement at the time of the post-conviction hearing because of an automobile theft charge and a probation violation from Jackson, Tennessee.

In denying the petition for post-conviction relief, the trial court credited counsel's testimony. The court found that the Petitioner wanted a quick resolution to the case and that a bench trial was requested to achieve that goal. The court found that the defense theory was to show that the Petitioner acted under duress and necessity to free a child from a locked car. The court found that although the Petitioner did not deny damaging the utility pole and wire at the trial, he claimed at the post-conviction hearing that he did not damage the pole or the wire. The court stated that the MLG&W incident report showed the pole sustained minimal damage. The court found that the Petitioner sought to change trial strategies after the chosen strategy failed at the trial and concluded that counsel was not deficient in arguing the Petitioner acted under duress and necessity. The court found that there was "ample evidence" showing the utility pole and wire were damaged. The court found that there was no evidence presented at the hearing to show that the Petitioner would have been successful at the trial had counsel argued that the Petitioner did not damage the pole or wire. The court noted that during the sentencing hearing, the Petitioner admitted "destroying someone else's property." With regard to the hearsay testimony offered by Mr. Locke at the trial, the court found that counsel did not object. This appeal followed.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2012).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the petitioner must also show that but for the substandard performance, there is a "reasonable probability that . . . the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). See Baxter, 523 S.W.2d at 936. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201.

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to

show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." Id.

**I**

The Petitioner contends that counsel's failure to object to Mr. Locke's hearsay testimony regarding damage to the utility pole was ineffective assistance. He argues that the trial court would have sustained an objection and prevented sufficient evidence supporting his conviction. The State responds that the trial court properly determined that counsel did not provide ineffective assistance of counsel. We agree with the State.

With regard to whether the utility pole was functional, Mr. Locke testified at the trial that he "thought at first that it was, but when the repair crew got there they said that it was not functional. I'm not an engineer. They came in and determined that it was not functional and had to be replaced." Counsel agreed that Mr. Locke's testimony regarding the engineers' conclusions about the functionality of the pole was inadmissible hearsay and that he did not object. Hearsay is a "statement . . . offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible unless it qualifies under an exception to the rule. Tenn. R. Evid. 802. "Hearsay is present only if the statement is used to prove the truth of the matter asserted in the statement. . . ." See Neil P. Cohen et al., Tennessee Law of Evidence § 9.01[7] (6th ed. 2011).

We conclude that counsel should have objected to the hearsay evidence. We also conclude, though, that had counsel objected and the trial court excluded Mr. Locke's hearsay testimony, the elements of destruction or interference with utility lines, fixtures, or appliances were sufficiently proven without the hearsay. Mr. Locke testified at the trial that after he arrived at the scene, he inspected the utility pole. When asked if he saw any damage, he stated, "The grounding wire had been pulled and damaged . . . flattened and pulled to the point where it wasn't as effective as it should have been for the job it needed to do." Although Mr. Locke believed the pole was still functional, he testified about the damage he observed. The Petitioner did not deny attempting to remove the wire or damaging the wiring. We conclude that the Petitioner has failed to establish prejudice.

## II

The Petitioner contends that counsel provided ineffective assistance by failing to obtain Mr. Locke's MLG&W incident report that discredited the evidence used to convict him. He argues that the report could have been used to impeach Mr. Locke's testimony regarding the extent of the damage. The State responds that counsel did not provide the Petitioner ineffective assistance. We agree with the State.

Although Mr. Locke testified that the engineers concluded the utility pole had to be replaced because of the damage, his incident report, received as a exhibit at the post-conviction hearing, showed he concluded that "[t]he damage to the grounding wire was minimal, and need[ed] no repair, and there was no actual theft of property." Mr. Locke testified at the trial that he believed the pole was functional before he spoke to the engineers who inspected the damage. The evidence contained in the incident report showing that Mr. Locke thought the damage was minimal was presented during Mr. Locke's trial testimony. We note that counsel did not recall the Petitioner's asking him to obtain a copy of the MLG&W incident report. Although counsel determined that duress and necessity were the best defenses available to the Petitioner, counsel made an uninformed decision to proceed on those defenses without the benefit of Mr. Locke's incident report. Although counsel's uninformed decision was deficient performance, the Petitioner has failed to establish prejudice. Although Mr. Locke's report showed minimal damage to the utility pole, the evidence at the trial showed that the pole was damaged. Counsel's credited testimony showed that the Petitioner never denied attempting to remove copper wire from the pole. Although counsel should have obtained a copy of Mr. Locke's report before choosing a defense, duress and necessity were reasonable in light of the facts. An unsuccessful strategy does not always support a claim of ineffective assistance of counsel. See Cooper, 847 S.W.2d at 528.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE